IN THE CIRCUIT COURT, FOURTH JUDICIAL CIRCUIT, IN AND FOR DUVAL COUNTY, FLORIDA

CASE NO.:
DIVISION:

AIRPRO DIAGNOSTICS, LLC, a Florida limited liability company,

        Plaintiff,

vs.

AUTOENGINUITY, LLC, an Arizona limited liability corporation, and OPUS IVS, INC., a Delaware corporation,

        Defendants.

_____/

## **COMPLAINT**

Plaintiff, AirPro Diagnostics, LLC ("AirPro Diagnostics"), hereby files this action against Defendants, AutoEnginuity, LLC ("AutoEnginuity") and Opus IVS, Inc. ("Opus") (collectively, "Defendants"), and in support states the following:

### **Parties, Venue and Jurisdiction**

1.      Plaintiff AirPro Diagnostics is a Florida limited liability company with its principal place of business located at 11737 Central Parkway, Jacksonville, Florida 32224.

2.      Defendant AutoEnginuity is an Arizona limited liability company with its principal place of business located at 1819 N Rosemont, Suite 101, Mesa, Arizona 85205.

3.      Defendant Opus is a Delaware corporation with its principal place of business located at 3915 Research Park Drive, Suite A8, Ann Arbor, Michigan 48108.

4.      Venue is proper in Duval County, Florida based upon the venue provision in the

Confidentiality and Noncircumvention Agreement alleged below, and the actions giving rise to this lawsuit occurred in Florida.

5.      Jurisdiction is proper in this Court because the damages sought are in excess of $50,000.00 exclusive of interest, costs and attorneys' fees.

6.      Jurisdiction is also appropriate in this Court pursuant to Section 26.012(2)(c), Florida Statutes, as it relates to the equitable claims brought by AirPro Diagnostics.

### General Allegations

7.      AirPro Diagnostics is a trusted global leader in automotive scanning, diagnostics, calibration and programing services.

8.      Prior to the inception of AirPro Diagnostics, two gentlemen named Steve Casella and Scotty West formed a company named CompuFlash, LLC ("Compuflash"). Compuflash sought to develop a device that could be used by independent automotive repair shops to perform vehicle module programming.

9.      Lonnie Margol, who is a well-known pioneer in the automotive repair industry, and a named inventor of an innovative multi-vehicle remote scan tool device, met with Compuflash regarding creating a new technology never seen before in the collision repair industry.

10.     Mr. Casella, Mr. West, and Mr. Margol collaborated to create a device and market it to collision and mechanical repair shops throughout North America.

11.     In 2016, AirPro Diagnostics was formed to serve as the distributor of the new device primarily to collision repair shops, with offerings to mechanical or other specialty repair shops, and also to provide skilled remote diagnostics, programming and calibration services utilizing highly trained brand specialists.

2

12.    Mr. Casella, Mr. West, and Mr. Margol were all members of Compuflash and AirPro Diagnostics.

13.    All intellectual property owned by Compuflash, as well as other rights to all protective agreements (including the Noncircumvention Agreement) and other rights, were assigned to, transferred to and became a part of AirPro Diagnostics.

14.    AirPro Diagnostics' device, called the AirPro, is an original, unique, and innovative combination of tools for expert remote technology access with AirPro Diagnostics' internally developed ORION diagnostic management system for seamless integration of expert driven repair guidance, communications and documentation for the automotive repair industry.

15.    The AirPro is an innovative tool, uniquely designed to meet the specific demands of collision repair. Traditional diagnostic tools alone could not effectively or reliably address these needs.   The AirPro was developed to provide on-demand access to remote diagnostics, programming, calibration, and diagnostic services,  supported by highly trained brand-specific diagnostic experts all while being directly connected to the vehicle.

16.    A depiction of the AirPro is as follows:



3

17.    After extensive research, AirPro Diagnostics specifically selected the product created and licensed by AutoEnginuity for use within the AirPro.  The AutoEnginuity product included both a Giotto software component and a ProLine hardware/interface component (hereinafter collectively referred to as the "Giotto product").

18.    Before AirPro Diagnostics entered into business with AutoEnginuity, the Giotto product was not used effectively in the collision repair industry.  Rather, the Giotto product was used in the automotive mechanical repair industry.  The Giotto product did not have the comprehensive diagnostic functionality to effectively service the collision repair industry.  The experience, expertise and direction of the founders of AirPro Diagnostics was key to improving the efficacy of the Giotto product for the collision repair industry.

19.    AutoEnginuity represented to AirPro Diagnostics that AutoEnginuity was not interested in expanding its offering in the collision repair industry and would not compete therein.

20.    On November 14, 2016, AirPro Diagnostics and AutoEnginuity entered into a Confidentiality and Noncircumvention Agreement (the "Noncircumvention Agreement"). A true and correct copy of the Noncircumvention Agreement is attached hereto and incorporated herein as **Exhibit A**.

21.    The AirPro is specifically identified and contemplated in the Noncircumvention Agreement.

22.    The Noncircumvention Agreement was intended, and the parties acted in conformity with such intent, for the Noncircumvention Agreement to protect all confidential information shared with AutoEnginuity.

23.    Based upon the Noncircumvention Agreement and understanding between the

4

parties, confidential information was shared with AutoEnginuity.

24.    The Noncircumvention Agreement defines Confidential Information as follows:

> **Definition of Confidential Information**:    "Confidential
> Information" means any information, knowledge, concept or idea
> which is furnished or communicated or accessible to Recipient by
> reason of Owner's disclosure thereof, on or after 11/14/16 (the
> ["]Effective Date" ), and, whether before or after the Effective Date
> of this Agreement, and regardless of its form or the manner which
> same is or was furnished, including, without limitation, (i) all
> information or data relating to patented and non-patented, developed
> and prototype, designed or conceptual, devices, plans, brands,
> strategies, budgets, third party identities within and without the
> automotive service and repair industries, notions, ideas, products,
> business plans, and practices, procedures, operations, delivery of
> services, and other proprietary information and data of any kind,
> nature, or description; (ii) Owner's trade Confidential Information,
> including but not limited to, those embodied in or involving
> software (including HTML code), hardware, services, or business
> practices; (iii) information regarding any and all processes,
> products, ideas, trade secrets, know-how, inventions, intellectual
> property, and proprietary technology or the unique component mix
> thereof; and (iv) marketing information and methods and
> commercial strategies, together with all analyses, compilations,
> studies, notes, memoranda, customer and vendor identity and
> information, or other documents or records and any such analyses,
> compilations, studies or other documents or records contained or
> otherwise reflected in or generated from such information, and any
> and all of same as they relate to Owner's service model and Owner's
> businesses, including but not limited to, the application thereof to
> the automotive service and repair industries and therein, servicing
> the commercial needs of the commercial enterprises which are a part
> thereof. While some of the information included is not proprietary
> or unique technologically, the facts communicated to Recipient or
> even the form or its compilation or the manner in which it is to be
> used, or the very idea itself, makes it Confidential Information.
> Confidential Information, however, does not include information
> which Recipient can show [by historical (before the Effective Date
> hereof) substantial documentary evidence] : (i) at the time of receipt
> from Owner was known by Recipient clearly and also that the
> industry specifically target and the exact composition of technology
> and technological components, is shown and is the same or similar

5

to Owner's notions, ideas and models, and further same is corroborated by independent means, and was not subject to any other non-disclosure agreement among the parties or their affiliates; (ii) was now or hereafter is entered in the public domain without any limitation on the commercial use thereof and therewith is known generally and widely to the public and through no action or omission of Recipient; (iii) was otherwise before the Effective Date developed lawfully and independently by Recipient without reference or comparison to Confidential Information of Owner and evidenced by irrefutable documentation; or (iv) was acquired lawfully by Recipient from a third party without any obligation of confidentiality.

(Exhibit A, ¶1).

25.    Additionally, the Noncircumvention Agreement includes a nondisclosure and non-circumvention agreement which states as follows:

**Nondisclosure and Non-Circumvention:** Recipient shall keep the Confidential Information confidential and during such period Recipient shall not disclose directly or indirectly any of the Confidential Information to any third party, unless authorized by Owner in writing. Recipient shall notify Owner in advance and in writing, of any of the Confidential Information which Recipient asserts is not subject to these obligations and upon which specific exemption such assertion is relying, and all prior to the disclosure of any part thereof which Owner asserts is Confidential Information. If Recipient is served with a legal and enforceable request for the production of information which may include any Confidential Information, Recipient shall notify Owner immediately and allow Owner to take any actions Owner determines necessary to protect the Confidential Information. **Any Confidential Information provided to Recipient cannot be used, exploited, sold, developed, or in any way a commercial benefit derived therefrom, except with Owner's written consent and agreement. Recipient understands under no circumstances whatsoever can any Confidential Information be utilized and thereby circumvent Owner's legal and exclusive ownership thereof** and Recipient is under the duty to assure the disclosure of the Confidential Information occurs only pursuant to the provisions of this Agreement and pursuant to the written agreement and consent of Owner as hereafter redefined and established between Owner and

6

Recipient and any possible third party.

> **From the Effective Date hereof, Recipient (except in concert with Owner) may not thereafter undertake any commercial activity within the automotive service and repair industries or any other industry which entails the use of Owner's Confidential Information or any attribute, concept or application thereof and which employs or utilizes any part of or is derived from the Confidential Information which is disclosed to Recipient by Owner.**

(Exhibit A, ¶2 (emphasis added)).

26.    Further, the Noncircumvention Agreement limits how Confidential Information could be used, and provides the following:

> Recipient shall use the Confidential Information solely for the purpose of evaluating or establishing a consulting, business or investment relationship with Owner or in pursuit of such relationship. Recipient's dissemination of the Confidential Information shall be limited to the employees or agents of Recipient and any third party to which Owner gives consent, and all of whom are under duties which justify the "need to know," and then only after those employees or agents sign a copy of the attached Confidentiality Acknowledgment Form attached hereto, and thereby agreeing to be bound by the terms of this Agreement. **Recipient shall not use the Confidential Information to compete against Owner in any way. Recipient may use the Confidential Information only in conjunction with Owner as they hereafter agree in writing and in no other way may same be exploited commercially.**

(Exhibit A, ¶3 (emphasis added)).

27.    Based upon the protection afforded in the Noncircumvention Agreement, Confidential Information was shared with AutoEnginuity.

28.    The main point of the Noncircumvention Agreement was to protect the intellectual property and Confidential Information of AirPro Diagnostics.

29.     After entering into the Noncircumvention Agreement in 2016, AirPro Diagnostics worked closely with AutoEnginuity for over five years.

30.     AirPro Diagnostics purchased over 1,730 of the ProLine tools/hardware from AutoEnginuity at approximately $850.00 each.  AirPro Diagnostics also purchased software update subscriptions on an annual basis or as needed at approximately $450.00 each.

31.     During this relationship, AirPro Diagnostics provided Confidential Information and recommendations to AutoEnginuity for the continuous development and improvement of the Giotto product's capabilities and performance within the collision repair industry.

32.     AirPro Diagnostics developed a unique methodology by which it was able to pull reports and identify mistakes related to the performance of the AutoEnginuity software and provided thousands of confidential "bug reports" to AutoEnginuity to contribute to the development and  improvement of the Giotto product.

33.     The information provided by AirPro Diagnostics enabled the development and enhancement of the Giotto product, transforming it from a tool primarily usable within the automotive repair industry, as it was prior to AirPro Diagnostics' involvement, into a product that is now both effective and commercially viable for use in the collision repair industry.

34.     Specifically, the information and assistance provided by AirPro Diagnostics to AutoEnginuity for the continuous development and improvement of the Giotto product allowed for the Giotto product to become an effective and viable tool for the collision repair industry.

35.     AirPro Diagnostics was never compensated in any form for its development and improvement of the Giotto product's capabilities or its development of the Giotto product for servicing the collision repair industry.

36.    AirPro Diagnostics used the Giotto product as one of its tools within the AirPro, which such use was confidential and not known to the public.

37.    In fact, AirPro Diagnostics kept the identity of AutoEnginuity and the Giotto product confidential and took multiple steps to ensure that the Giotto product within the AirPro was concealed and not known by encasing the Giotto hardware and thereby removing any identifiable information relating to AutoEnginuity.  This was done in an effort to protect AirPro Diagnostics' unique combination of tools from being known to the public or any current or would be competitors.  AutoEnginuity was aware that this information was protected by AirPro Diagnostics and was aware that the tools used within the AirPro were highly confidential and proprietary to AirPro Diagnostics and how the AirPro worked.  However, it is AirPro Diagnostics' belief that AutoEnginuity and Opus disclosed this Confidential Information.

38.    On or about January 2, 2020, and without any prior notice to AirPro Diagnostics, Opus acquired AutoEnginuity.[1]

39.    After Opus' acquisition of AutoEnginuity, Brian Herron, President of Opus, and Jay Horak, owner of AutoEnginuity, represented to AirPro Diagnostics that AutoEnginuity and Opus would not compete with AirPro Diagnostics in the collision repair industry and requested that AirPro Diagnostics continue in its relationship with AutoEnginuity and Opus.

40.    AirPro Diagnostics understood the statements by Brian Herron and Jay Horak as affirmation of the protections in the Noncircumvention Agreement.

---

[1] AirPro Diagnostics is uncertain regarding the full scope of Opus' acquisition of AutoEnginuity.  It is not clear whether AutoEnginuity fully merged into Opus and thus is no longer a separate and distinct legal entity.  AirPro Diagnostics intends to learn this through discovery.  However, out of an abundance of caution, AirPro Diagnostics is naming both AutoEnginuity and Opus in this lawsuit and may collectively refer to AutoEnginuity and Opus as "AutoEnginuity/Opus."

41.    By its acquisition of AutoEnginuity, Opus became obligated under the Noncircumvention Agreement the same as AutoEnginuity.

42.    Pursuant to the Noncircumvention Agreement, the parties were prevented from disclosing any information received under the Noncircumvention Agreement, and further agreed that the disclosed information "cannot be used, exploited, sold, developed, or in any way a commercial benefit derived therefrom." (Exhibit A, ¶ 2).

43.    In fact, the Noncircumvention Agreement specifically prohibited AutoEnginuity from any commercial activity within the collision repair industry.  (Exhibit A, ¶ 2).  This restriction was deliberately negotiated and included in the Noncircumvention Agreement because AutoEnginuity was not conducting business in the collision repair industry.  As such, AirPro Diagnostics was willing to collaborate with AutoEnginuity and share its Confidential Information knowing that it would not be used against, or to compete with, AirPro Diagnostics in the collision repair industry.

44.    As part of its own performance under the Noncircumvention Agreement, AirPro Diagnostics disclosed to AutoEnginuity significant details regarding all components of AirPro Diagnostics' operation including, but not limited to, its business model, pricing structure, receipts, invoices, etc.

45.    AirPro Diagnostics also disclosed how it uses specific tools and OEM software to provide and deliver reports and services to customers, and how its use of the Giotto product in conjunction with another piece of technology allowed AirPro Diagnostics to successfully provide remote diagnostic services to collision repair shops for a wide range of vehicles.

46.    Other Confidential Information allowed AutoEnginuity to, among other things,

determine the number of AirPros in the field as well as inventory on hand.

47.     Simply put, AirPro Diagnostics taught AutoEnginuity how the AirPro works, and how its technology competes with other competitors in the collision repair industry, namely the asTech device, developed and distributed by asTech (a/k/a Repairify, Inc.).

48.     Despite the restrictions in the Noncircumvention Agreement, AutoEnginuity/Opus took information obtained from AirPro Diagnostics under the Noncircumvention Agreement and wrongfully exploited this information for their own benefit after reaffirming their commitment not to compete.

49.     On or about October 21, 2021, AutoEnginuity/Opus abruptly prohibited AirPro Diagnostics from continuing to use the Giotto product.  Simply put, AutoEnginuity/Opus  shut down AirPro Diagnostics' ability to use the Giotto product, the product AirPro Diagnostics developed to service the collision industry.

50.     At some time thereafter, AirPro Diagnostics learned that AutoEnginuity/Opus was using the Giotto product in competition with AirPro Diagnostics in the collision repair industry.

51.     Upon information and belief, AutoEnginuity/Opus used AirPro Diagnostics' Confidential Information and technical knowledge to develop a scanning, programming, and diagnostic services device which incorporates the Giotto product in order to directly compete with AirPro Diagnostics in the collision repair industry.

52.     In fact, upon information and belief, AutoEnginuity/Opus is using the idea and invention of AirPro Diagnostics, which was to run the Giotto software through the J2534 hardware instead of through the Giotto hardware.

53.     Had it not been for the Confidential Information provided by AirPro Diagnostics to

AutoEnginuity/Opus, AutoEnginuity/Opus would not have an effective scanning, programming, and diagnostic services device that competes with AirPro Diagnostics in the collision repair industry. This is because the Confidential Information and assistance provided by AirPro Diagnostics to AutoEnginuity/Opus for continuous development and improvement of the Giotto product was critical for the Giotto product's use in the collision repair industry. Without the Confidential Information provided by AirPro Diagnostics, the Giotto product would have only been effective in the automotive mechanical repair industry and would not have been effective in the collision repair industry.

54. Thus, while AirPro Diagnostics shared Confidential Information with AutoEnginuity/Opus and helped develop and improve the Giotto product, AutoEnginuity/Opus took that information, is preventing AirPro Diagnostics from continuing to use the product, and continues to use the Giotto product to compete against AirPro Diagnostics in the collision repair industry.

55. As a result of AutoEnginuity/Opus's actions, AutoEnginuity/Opus ended up with the Giotto product improved by AirPro Diagnostics and is using the Giotto product to compete against AirPro Diagnostics in the collision repair industry, which it expressly agreed not to do.

56. AutoEnginuity/Opus's actions were willful and intentional and done in an effort to harm AirPro Diagnostics and to benefit AutoEnginuity/Opus.

57. AirPro Diagnostics intends to subsequently amend its Complaint to seek punitive damages under Section 768.72(1), Florida Statutes.

58. AirPro Diagnostics has retained the undersigned counsel to represent it in this action and is entitled to recover its attorneys' fees and costs.

59.     All conditions precedent to the claims for relief asserted herein have been performed, satisfied or waived.

## COUNT I
### (Breach of the Noncircumvention Agreement)

60.     AirPro Diagnostics realleges and incorporates herein by reference paragraphs 1 through 59 above as if fully set forth herein.

61.     This is an action for damages arising from Defendants' breach of the Noncircumvention Agreement.

62.     The Noncircumvention Agreement is a valid and enforceable contract, to which Defendants are bound.

63.     Defendants agreed to the following in paragraph 2 of the Noncircumvention Agreement:

> Any Confidential Information provided to Recipient cannot be used, exploited, sold, developed, or in any way a commercial benefit derived therefrom, except with Owner's written consent and agreement. Recipient understands under no circumstances whatsoever can any Confidential Information be utilized and thereby circumvent Owner's legal and exclusive ownership thereof and Recipient is under the duty to assure the disclosure of the Confidential Information occurs only pursuant to the provisions of this Agreement and pursuant to the written agreement and consent to Owner as hereafter redefined and established between Owner and Recipient and any possible third party.

> From the Effective Date hereof, Recipient (except in concert with Owner) may not thereafter undertake any commercial activity within the automotive service and repair industries or any other industry which entails the use of Owner's Confidential Information or any attribute, concept or application thereof and which employs or utilizes any part of or is derived from the Confidential Information which is disclosed to Recipient by Owner.

(Exhibit A, ¶ 2).

64.    Defendants breached the Noncircumvention Agreement.

65.    Defendants' breaches of the Noncircumvention Agreement include, but are not limited to, the following:  (A) disclosing AirPro Diagnostics' Confidential Information; (B) using AirPro Diagnostics' Confidential Information to create a competing scanning, programming, and diagnostic services device for a commercial benefit; and (C) directly competing with AirPro Diagnostics in the collision repair industry.

66.    As a direct and proximate result of Defendants' actions, AirPro Diagnostics has been severely damaged.

67.    AirPro Diagnostics is entitled to recover its reasonable attorneys' fees and costs incurred in prosecution of this matter pursuant to paragraph 7 of the Noncircumvention Agreement.

**WHEREFORE**, Plaintiff, AirPro Diagnostics, LLC, respectfully requests this Honorable Court enter judgment for AirPro Diagnostics and against Defendants, AutoEnginuity, LLC and Opus IVS, Inc., for compensatory damages, special damages, pre-judgment interest, post-judgment interest, injunctive relief, attorneys' fees, costs, and such other and further relief as this Court deems just and proper.

**COUNT II**
**(Breach of Third-Party Beneficiary Agreement)**

68.    AirPro Diagnostics realleges and incorporates herein by reference paragraphs 1 through 59 above as if fully set forth herein.

69.    This is cause of action for breach of a third-party beneficiary agreement, and is being pled in the alternative to Count I.

70.     Compuflash and AutoEnginuity are identified as being parties to the Noncircumvention Agreement.

71.     The AirPro is mentioned in the Noncircumvention Agreement, and Compuflash, AutoEnginuity and AirPro Diagnostics specifically intended for the Noncircumvention Agreement to apply to, benefit and protect AirPro Diagnostics and the AirPro.

72.     AirPro Diagnostics specifically relied on the Noncircumvention Agreement to its detriment, by providing Confidential Information to AutoEnginuity/Opus.

73.     Defendants breached the Noncircumvention Agreement.

74.     Defendants' breaches of the Noncircumvention Agreement include, but are not limited to, the following:  (A) disclosing AirPro Diagnostics' Confidential Information; (B) using AirPro Diagnostics' Confidential Information to create a competing scanning, programming, and diagnostic services device for a commercial benefit; and (C) directly competing with AirPro Diagnostics in the collision repair industry.

75.     As a direct and proximate result of Defendants' actions, AirPro Diagnostics has been severely damaged.

76.     AirPro Diagnostics is entitled to recover its reasonable attorneys' fees and costs incurred in prosecution of this matter pursuant to paragraph 7 of the Noncircumvention Agreement.

**WHEREFORE**, Plaintiff, AirPro Diagnostics, LLC, respectfully requests this Honorable Court enter judgment for AirPro Diagnostics and against Defendants, AutoEnginuity, LLC and Opus IVS, Inc., for compensatory damages, special damages, pre-judgment interest, post-judgment interest, injunctive relief, attorneys' fees, costs, and such other and further relief as this

Court deems just and proper.

## COUNT III
### (Misappropriation of Trade Secrets)

77.    AirPro Diagnostics realleges and incorporates herein by reference paragraphs 1 through 59 above as if fully set forth herein.

78.    Chapter 688, Florida Statutes, commonly referred to as Florida's Uniform Trade Secrets Act ("FUTSA") provides for compensatory damages as well as injunctive relief for the actual or threatened misappropriation of trade secrets.

79.    Section 688.003, Florida Statutes, provides for injunctive relief to, among other things, eliminate commercial advantages that were derived from the misappropriation of trade secrets.  *See* §688.003(1), Fla. Stat.  Additionally, an injunction may condition future use of the trade secrets upon payment of a reasonable royalty.  *See* §688.003(2), Fla. Stat.

80.    Section 688.004, Florida Statutes, provides for damages, which can include both actual losses caused by misappropriation and the unjust enrichment caused by misappropriation, or imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret. *See* §688.003(1), Fla. Stat.  In addition to other damages permitted in Section 688.004, where there is malicious misappropriation, the Court may award exemplary damages in an amount not exceeding twice the amount of damages awarded against the misappropriator. *See* §688.003(2), Fla. Stat.

81.    Defendants willfully and maliciously misappropriated AirPro Diagnostics' trade secrets and Confidential Information without express or implied approval from AirPro Diagnostics.

16

82.    The trade secrets that Defendants willfully and maliciously misappropriated, include, but are not limited to, how the AirPro works, the combination of tools and components within the AirPro, the Confidential Information regarding how the Giotto product worked in connection with the other tools within the AirPro, and the development and improvement of the Giotto product for use in the AirPro and in the collision repair industry.

83.    Defendants' willful and malicious misappropriation of trade secrets was done in an effort to compete with AirPro Diagnostics in the collision repair industry.

84.    Such trade secrets also include among other things, the number of AirPros using the Giotto product in the field with its collision shop customers as well as inventory on hand for further distribution and competition.

85.    The trade secrets and Confidential Information derive their economic value from not being generally known or readily ascertainable by the public and in particular by competitors.

86.    AirPro Diagnostics has not disclosed its trade secrets or Confidential Information to the public and has undertaken reasonable efforts to protect their confidentiality, including through employment of various non-disclosure agreements with business partners, vendors, and others.

87.    Defendants' misappropriation of AirPro Diagnostics' trade secrets and Confidential Information has caused, and will continue to cause, significant irreparable damage to AirPro Diagnostics.

**WHEREFORE**, Plaintiff, AirPro Diagnostics, LLC, respectfully requests this Honorable Court enter judgment for AirPro Diagnostics and against Defendants, AutoEnginuity, LLC and Opus IVS, Inc., for damages under Section 688.004, Florida Statutes, injunctive relief under

17

Section 688.003, Florida Statutes, royalties under Sections 688.003 and 688.004, Florida Statutes, pre-judgment interest, post-judgment interest, attorneys' fees, costs, and such other and further relief as this Court deems just and proper.

**COUNT IV**
**(Permanent Injunctive Relief)**

88.    AirPro Diagnostics realleges and incorporates herein by reference paragraphs 1 through 59 above as if fully set forth herein.

89.    This is an action for permanent injunctive relief against Defendants.

90.    AirPro Diagnostics does not have an adequate remedy at law with respect to the protection and improper use of its Confidential Information.

91.    Based upon the obligations arising under the Noncircumvention Agreement, AirPro Diagnostics has a substantial likelihood of success on the merits of its claims.

92.    Furthermore, AirPro Diagnostics believes in good faith that Defendants will attempt or continue to use AirPro Diagnostics' Confidential Information unless prohibited by an injunction from this Court.

93.    In fact, Defendants are continuing to use AirPro Diagnostics' Confidential Information including using the AirPro Diagnostics-improved-Giotto product within Defendants' scanning, programming, and diagnostic services device, which Defendants are currently using to compete against AirPro Diagnostics in the collision repair industry.

94.    Defendants' breaches of the Noncircumvention Agreement and use of Confidential Information are a direct and proximate cause of irreparable damages to AirPro Diagnostics.

95.    The threat of future harm to AirPro Diagnostics is immediate.

96.     The issuance of the injunctive relief requested herein does not offend the public interest as AirPro Diagnostics is entitled to protect its trade secrets and Confidential Information as identified in the Noncircumvention Agreement.

**WHEREFORE**, Plaintiff, AirPro Diagnostics, LLC, respectfully requests the entry of a permanent injunction against Defendants, AutoEnginuity, LLC and Opus IVS, Inc.: 1) enjoining Defendants from using or disclosing any Confidential Information of Compuflash and AirPro Diagnostics (as defined in the Noncircumvention Agreement); 2) enjoining Defendants from violating the Noncircumvention Agreement; 3) mandating that the Defendants return all Confidential Information to AirPro Diagnostics; 4) enjoining Defendants from competing against AirPro Diagnostics in the collision repair industry; 5) enjoining Defendants' use of the Giotto product in the collision repair industry; 6) awarding AirPro Diagnostics its costs and attorneys' fees; and 7) granting AirPro Diagnostics any and all further relief that the Court deems just and proper.

<u>**COUNT V**</u>
**(Fraud)**

97.     AirPro Diagnostics realleges and incorporates herein by reference paragraphs 1 through 59 above as if fully set forth herein.

98.     In early 2020, Brian Herron, President of Opus, and Jay Horak, owner of AutoEnginuity, represented to AirPro Diagnostics that AutoEnginuity and Opus would not compete with AirPro Diagnostics in the collision repair industry and requested that AirPro Diagnostics continue in its relationship with AutoEnginuity and Opus.

99.     Mr. Herron and Mr. Horak also requested that AirPro Diagnostics continue in its

19

then-existing relationship with AutoEnginuity, including continuing to provide Confidential Information for developing and improving the Giotto product.

100.    Based upon Mr. Herron's and Mr. Horak's representations, AirPro Diagnostics continued with its relationship with AutoEnginuity and continued to disclose Confidential Information to AutoEnginuity/Opus as well as provide Confidential Information to continue the improvement of the Giotto product until AutoEnginuity/Opus shut down AirPro Diagnostics' use of the Giotto product in October of 2021.

101.    Mr. Herron's and Mr. Horak's statements on behalf of AutoEnginuity/Opus were false and intended to mislead AirPro Diagnostics.

102.    AirPro Diagnostics was not aware that these statements were false until after AutoEnginuity/Opus shut down AirPro Diagnostics' use of the Giotto product in October of 2021.

103.    Mr. Herron, Mr. Horak, AutoEnginuity and Opus intended for AirPro Diagnostics to rely upon the false statements and for AirPro Diagnostics to continue to share Confidential Information and assist in the continued improvement of the Giotto product.

104.    After AirPro Diagnostics continued to share Confidential Information and assisted in improving the Giotto product, AutoEnginuity/Opus used AirPro Diagnostic's Confidential Information to create a scanning, programming, and diagnostic services device that competes with AirPro Diagnostics in the collision repair industry and then prohibited AirPro Diagnostics from continuing to use the Giotto product.

105.    As a result of AirPro Diagnostics' reliance on the aforementioned statements, AirPro Diagnostics has been severely damaged.

**WHEREFORE**, Plaintiff, AirPro Diagnostics, LLC, respectfully requests this Honorable

Court enter judgment for AirPro Diagnostics and against Defendants, AutoEnginuity, LLC and Opus IVS, Inc., for compensatory damages, special damages, pre-judgment interest, post-judgment interest, costs, and such other and further relief as this Court deems just and proper.

**COUNT VI**
**(Declaratory Judgment)**

106.     AirPro Diagnostics realleges and incorporates herein by reference paragraphs 1 through 59 above as if fully set forth herein.

107.     This is an action for declaratory judgment pursuant to Section 86.021, Florida Statutes.

108.     The Noncircumvention Agreement is a valid and binding contract.

109.     The Noncircumvention Agreement is reasonable in its restrictions on Defendants' conduct.

110.     AirPro Diagnostics is still in the remote diagnostics service and collision repair industry.

111.     Enforcement of the Noncircumvention Agreement is necessary to protect the legitimate business interests AirPro Diagnostics has in its scanning, programming, and diagnostic services device technology in the collision repair and remote diagnostic services market.

112.     AirPro Diagnostics provided Confidential Information to AutoEnginuity/Opus under the Noncircumvention Agreement, including, but not limited to, information regarding the AirPro, how the AirPro works, the combination of tools and components within the AirPro, the Confidential Information regarding how the Giotto product worked in connection with the other tools within the AirPro, and the development and improvement of the Giotto product for use in the

collision repair industry.

113.    AirPro Diagnostics invested significant time and resources and provided its Confidential Information to AutoEnginuity/Opus to improve the AirPro's (which incorporated the Giotto product) use within the collision repair industry.  As such, AirPro Diagnostics has a right to restrict the use of the Giotto product within the collision repair industry.

114.    Defendants have breached the Noncircumvention Agreement by using AirPro Diagnostics' Confidential Information to compete against AirPro Diagnostics.

115.    AirPro Diagnostics is entitled to recover its reasonable attorneys' fees and costs incurred in prosecution of this matter pursuant to paragraph 7 of the Noncircumvention Agreement.

**WHEREFORE**, Plaintiff, AirPro Diagnostics, LLC, requests that this Honorable Court declare the following:

   a.  AirPro Diagnostics is a party to the Noncircumvention Agreement or is an intended third-party beneficiary of the Noncircumvention Agreement.

   b.  The Noncircumvention Agreement is valid and enforceable against Defendants.

   c.  AirPro Diagnostics provided Confidential Information to Defendants pursuant to the Noncircumvention Agreement.

   d.  AirPro Diagnostics' Confidential Information was incorporated into and used to improve the Giotto product for its use in the collision repair industry.

   e.  AirPro Diagnostics has an ownership interest in the Giotto product as it relates to the Giotto product's capabilities and use in the collision repair industry.

   f.  Defendants have breached the Noncircumvention Agreement.

g. AirPro Diagnostics is entitled to enforce the Noncircumvention Agreement.

## COUNT VII
**(Unjust Enrichment)**

116.    AirPro Diagnostics realleges and incorporates herein by reference paragraphs 1 through 19, 30 through 39, 46, 47, 49 through 56, and 59 above as if fully set forth herein.

117.    AirPro Diagnostics has conferred a benefit on Defendants.

118.    Specifically, AirPro Diagnostics actively worked with AutoEnginuity/Opus to develop and improve the Giotto product for AirPro Diagnostics' use of it in the collision repair industry.

119.    The Confidential Information and assistance provided by AirPro Diagnostics to AutoEnginuity/Opus for continuous development and improvement of the Giotto product was critical for AutoEnginuity/Opus's use of the Giotto product to compete in the collision repair industry.

120.    Without the Confidential Information provided by AirPro Diagnostics, the Giotto product would not have been effective in the collision repair industry.

121.    Had it not been for the Confidential Information provided by AirPro Diagnostics to AutoEnginuity/Opus to improve the Giotto product, AutoEnginuity/Opus would not have a scanning, programming, and diagnostic services device that competes with AirPro Diagnostics in the collision repair industry.

122.    Defendants were aware of the benefit conferred by AirPro Diagnostics.

123.    Defendants accepted and retained this benefit conferred by AirPro Diagnostics.

124.    Defendants' acceptance and retention of this benefit under the circumstances make

it inequitable for Defendants to retain the benefit without paying the value thereof.

**WHEREFORE**, Plaintiff, AirPro Diagnostics, LLC, demands judgment against Defendants, AutoEnginuity, LLC and Opus IVS, Inc., for actual and special damages, disgorgement of profits, royalties, prejudgment interest, post judgment interest, costs, and any and all further relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

AirPro Diagnostics, LLC, hereby demands a trial by jury on all issues so triable.

**JIMERSON BIRR, P.A.**

By: _____

Austin T. Hamilton
Florida Bar No. 0099431
ahamilton@jimersonfirm.com
Mateo C. Dayo, IV
Florida Bar No. 1049754
mdayo@jimersonfirm.com
One Independent Drive Suite 1400
Jacksonville, FL 32202
Telephone: (904) 389-0050
Facsimile: (904) 212-1269
fileclerk@jimersonfirm.com
*Counsel for Plaintiff*

## NOTICE OF E-MAIL DESIGNATION

Plaintiff designates the following email addresses for service of court documents by electronic means in accordance with the Florida Rules of Judicial Administration:

Austin T. Hamilton:      ahamilton@jimersonfirm.com (primary)
fileclerk@jimersonfirm.com (secondary)


Mateo C. Dayo, IV:      mdayo@jimersonfirm.com (primary)
fileclerk@jimersonfirm.com (secondary)

EXHIBIT A

CONFIDENTIALITY AND NONCIRCUMVENTION AGREEMENT

This Confidentiality and Non-circumvention Agreement ("Agreement") is by and between ___AutoEngineering___ whose mailing address is ___3715 E Palm St Mesa AZ___ ("Recipient"), which term includes all persons and entities related, directly or indirectly, to the undersigned and regardless of whether by example, employment, business or social association and which includes all affiliates and subsidiaries of Recipient and **CompuFLASH, Inc.** (the "Owner") and the business address of address of which is 1633 Banks Road Margate, FL 33063. Recipient and Owner are sometimes referred to individually as a "Party" and collectively as the "Parties".

Recipient and Owner are interested in a possible business relationship regarding Owner's ideas, information and business concepts, market approaches and relationships, related to any of Owner's ideas and concepts and its developed business models and operations and including, but not limited to, Owner's proprietary commercial undertakings, enterprises and businesses known as the **AirPro** hardware and the supporting software programs thereof. In order for Recipient to evaluate a relationship, Owner will make Confidential Information available to Recipient. Owner is concerned about the disclosure or exploitation of the Confidential Information when not fully under Owner's control and direction, and contrary to Owner's best interests, once disclosed. The Recipient hereby recognizes the financial, personal, conceptual, creative, technical and non-technical information, which may be given or shown to Recipient or to which Recipient will be granted access by Owner, and by any of its counsel, agents, employees or representatives, such as, but not limited to, any ideas, notions, drawings, technology applications and component utilizations, budgets, communications, identities of third parties, plans, specifications, computer data, methods, knowledge, know-how, techniques, manuals, intellectual property and the like, both written and unwritten used and/or created by the Owner, and that all of same constitutes valuable Confidential Information, proprietary property and confidential assets of the Owner.

Recipient and Owner agree as follows:

1. **Definition of Confidential Information:** "Confidential Information" means any information, knowledge, concept or idea which is furnished or communicated or accessible to Recipient by reason of Owner's disclosure thereof, on or after ___11/14/16___ (the Effective Date"), and, whether before or after the Effective Date of this Agreement, and regardless of its form or the manner which same is or was furnished, including, without limitation, (i) all information or data relating to patented and non-patented, developed and prototype, designed or conceptual, devices, plans, brands, strategies, budgets, third party identities within and without the automotive service and repair industries, notions, ideas, products, business plans, and practices, procedures, operations, delivery of services, and other proprietary information and data of any kind, nature, or description; (ii) Owner's trade Confidential Information, including but not limited to, those embodied in or involving software (including HTML code), hardware, services, or business practices; (iii) information regarding any and all processes, products, ideas, trade secrets, know-how, inventions, intellectual property, and proprietary technology or the unique component mix thereof; and (iv) marketing information and methods and commercial

strategies, together with all analyses, compilations, studies, notes, memoranda, customer and vendor identity and information, or other documents or records and any such analyses, compilations, studies or other documents or records contained or otherwise reflected in or generated from such information, and any and all of same as they relate to Owner's service model and Owner's businesses, including but not limited to, the application thereof to the automotive service and repair industries and therein, servicing the commercial needs of the commercial enterprises which are a part thereof.  While some of the information included is not proprietary or unique technologically, the facts communicated to Recipient or even the form or its compilation or the manner in which it is to be used, or the very idea itself, makes it Confidential Information, however, does not include information which Recipient can show [by historical (before the Effective Date hereof) substantial documentary evidence]: (i) at the time of receipt from Owner was known by Recipient clearly and also that the industry specifically target and the exact composition of technology and technological components, is shown and is the same or similar to Owner's notions, ideas and models, and further same is corroborated by independent means, and was not subject to any other non-disclosure agreement among the parties or their affiliates; (ii) was now or hereafter is entered in the public domain without any limitation on the commercial use thereof and therewith is known generally and widely to the public and through no action or omission of Recipient; (iii) was otherwise before the Effective Date developed lawfully and independently by Recipient without reference or comparison to Confidential Information of Owner and evidenced by irrefutable documentation; or (iv) was acquired lawfully by Recipient from a third party without any obligation of confidentiality.

2. **Nondisclosure and Non-Circumvention**:  Recipient shall keep the Confidential Information confidential and during such period Recipient shall not disclose directly or indirectly any of the Confidential Information to any third party, unless authorized by Owner in writing.  Recipient shall notify Owner in advance and in writing, of any of the Confidential Information which Recipient asserts is not subject to these obligations and upon which specific exemption such assertion is relying, and all prior to the disclosure of any part thereof which Owner asserts is Confidential Information.   If Recipient is served with a legal and enforceable request for the production of information which may include any Confidential Information, Recipient shall notify Owner immediately and allow Owner to take any actions Owner determines necessary to protect the Confidential Information.   Any Confidential Information provided to Recipient cannot be used, exploited, sold, developed, or in any way a commercial benefit derived therefrom, except with Owner's written consent and agreement. Recipient understands under no circumstances whatsoever can any Confidential Information be utilized and thereby circumvent Owner's legal and exclusive ownership thereof and Recipient is under the duty to assure the disclosure of the Confidential Information occurs only pursuant to the provisions of this Agreement and pursuant to the written agreement and consent of Owner as hereafter redefined and established between Owner and Recipient and any possible third party.

From the Effective Date hereof, Recipient (except in concert with Owner) may not thereafter undertake any commercial activity within the automotive service and repair industries or any other industry which entails the use of Owner's Confidential Information or any attribute,

concept or application thereof and which employs or utilizes any part of or is derived from the Confidential Information which is disclosed to Recipient by Owner.

3.    **Use**:  Recipient shall use the Confidential Information solely for the purpose of evaluating or establishing a consulting, business or investment relationship with Owner or in pursuit of such relationship.  Recipient's dissemination of the Confidential Information shall be limited to the employees or agents of Recipient and any third party to which Owner gives consent, and all of whom are under duties which justify the "need to know," and then only after those employees or agents sign a copy of the attached Confidentiality Acknowledgment Form attached hereto, and thereby agreeing to be bound by the terms of this Agreement.  Recipient shall not use the Confidential Information to compete against Owner in any way.  Recipient may use the Confidential Information only in conjunction with Owner as they hereafter agree in writing and in no other way may same be exploited commercially.

4.    **Absolute Performance**: The doctrine of substantial performance does not apply to the use and protection of the Confidential Information and strict and absolute performance of the terms of this Agreement are required.  Unauthorized disclosure of any Confidential Information will cause irreparable harm and substantial monetary damages to Owner.

5.    **Ownership**: All Confidential Information is and shall continue to be the exclusive property of Owner, despite the fact any Confidential Information is entrusted to Recipient.  Recipient's possession of the Confidential Information does not confer any license, interest or rights of any kind in or to the Confidential Information.  The Recipient shall not, directly or indirectly, contest or cause to be contested the rights of the Owner, or affiliates, in and to patents, patents pending, trademarks, trade names and Confidential Information.  Recipient hereby agrees to execute such documentation as Owner may require in order to confirm the Owner's sole ownership of and rights to any and all of the Confidential Information transmitted, disclosed or otherwise availed to Recipient hereunder.  Recipient hereby agrees that Owner's Chief Executive Officer or agent thereof may act as attorney in fact to Recipient to undertake all appropriate steps to perfect and vest in Owner or its nominee of all of Owner's right, title and interest in and to Owner's Confidential Information and lawful trade secrets, inventions or discoveries.

6.    **Return of Confidential Information**:  Upon written request, Recipient will promptly and no later than within three (3) business days thereof, return all files of the Confidential Information and whether contained in written, electronic or other archival form which is possessed by Recipient and shall not keep any such Confidential Information, including but not limited to, any electronic files contained in Recipient's back up and disaster recovery systems and file servers.

7.    **Miscellaneous**: For purposes of this instrument:  (i) this is a Florida contract calling for Recipient's performance in the State of Florida and which represents sufficient contacts with the State of Florida for the purposes of Recipient submitting to the personal jurisdiction of the courts of the State of Florida and this particular acknowledgment and agreement is a material element to Owner disclosing the Confidential Information to Recipient; (ii) all notices shall be deemed given sufficiently if delivered or mailed certified mail, postage prepaid to the addresses set forth above or sent electronically and then send by such method of certified delivery; (iii) the captions are for convenience and not interpretation; (iv) the rights and obligations will inure to the benefit of and be binding upon the parties and their successors and assigns; (v) any

modification to the provisions must in writing and signed by both parties; (vi) all words should be construed to be of such gender or number as the context indicates; (vii) unless otherwise expressly provided, the word "include" or any derivative, is not to be a term of limitation; (viii) any interpretation will be based upon the laws of Florida, without application of conflicts of laws principles; (ix) with regard to all dates and time periods set forth or referred to, time is of the essence; (x) it may be executed in one or more counterparts and hereafter acknowledged, each of which will be treated as be an original and all of which when taken together will be deemed to constitute one instrument; (xi) Recipient enjoyed the opportunity to receive independent legal advice regarding the advisability of signing this instrument and the meaning of its provisions; (xii) in the event Owner must engage legal representation to enforce this Agreement or protect the Confidential Information, then Owner in such matter shall be entitled to be reimbursed for the fees of attorneys, paralegals and law clerks and all costs, and regardless whether incurred before, after or during written correspondence, civil proceedings, trial, appellate proceeding or in bankruptcy proceedings; and (xiii) venue for any proceeding concerning the enforcement, construction, modification or otherwise relating to this Confidentiality Agreement shall be the Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida, or the United States Federal District Court, Middle District of Florida, Jacksonville Division.

**The foregoing Confidentiality and Non-Circumvention Agreement was executed respectively by the parties as of the below dates and to be the understanding thereof as of the Effective Date hereof.**

RECIPIENT

Sign: 

By: JAY HORAK

Its: OWNER

Date: 11/14/16

OWNER

CompuFLASH, Inc.

By: Lonnie E. Margol

Its: Chief Executive Officer

Date: 11-14-16