# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

AIRPRO DIAGNOSTICS, LLC

     Plaintiff,

v.                        Case No. 3:24-cv-01330-TJC-LLL

OPUS IVS, INC., a Delaware corporation, and AUTOENGINUITY, LLC, an Arizona limited liability company

     Defendants.

## DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendants Opus IVS, Inc. ("Opus") and AutoEnginuity, LLC ("AutoEnginuity") (collectively, "Defendants"), by and through the undersigned counsel, hereby file their Answer and Counterclaims to Plaintiff AirPro Diagnostics, LLC's ("AirPro" or "Plaintiff") Complaint as set forth herein. Except as expressly admitted, modified, or explained, each and every allegation contained in AirPro's Complaint is hereby denied.[1]

## ANSWER

1.     Admitted upon information and belief.

2.     Denied.

---

[1] AutoEnginuity merged into Opus on December 31, 2020, as evidenced by the Certificate of Merger attached hereto as <u>Exhibit A</u>.

3.      Denied.  Admitted that Opus is a Delaware corporation with its principal place of business located at 7322 Newman Blvd, Building 3, Dexter, MI 48130.

4.      Denied.

5.      Denied that jurisdiction was proper in Florida Circuit Court or that Airpro's damages exceed $50,000.  Admitted that jurisdiction is proper in this Court and that Opus's damages exceed $75,000.

6.      Denied.

7.      Denied.

8.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 and therefore deny the same.

9.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 and therefore deny the same.

10.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 and therefore deny the same.

11.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11 and therefore deny the same.

12.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 and therefore deny the same.

13.    Denied.

14.    Denied.

15.    Denied that "[t]he AirPro is an innovative tool, uniquely designed to meet the specific demands of collision repair" and that "[t]raditional diagnostic tools alone could not effectively or reliably address these needs." Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 15 and therefore deny the same.

16.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 and therefore deny the same.

17.    Admitted that the AutoEnginuity "Giotto" product included both a software component and a hardware component.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17 and therefore deny the same.

18.    Denied.

19.    Denied.

20.    Denied.

3

21.    The purported Noncircumvention Agreement is a written document which speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 21 are inconsistent with those contents, Defendants deny the same.

22.    Denied.

23.    Denied.

24.    The purported Noncircumvention Agreement is a written document which speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 24 are inconsistent with those contents, Defendants deny the same.

25.    The purported Noncircumvention Agreement is a written document which speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 25 are inconsistent with those contents, Defendants deny the same.

26.    The purported Noncircumvention Agreement is a written document which speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 26 are inconsistent with those contents, Defendants deny the same.

27.    Denied.

28.    Denied.

29.    Denied.

30.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 and therefore deny the same.

31.    Denied.

32.    Denied.

33.    Denied.

34.    Denied.

35.    Denied.  Defendants specifically deny that AirPro developed or improved the Giotto product's capabilities or that AirPro developed the Giotto product for servicing the collision repair industry.

36.    Admitted that AirPro used the Giotto product but denied as stated that AirPro "used the Giotto product as one of *its* tools within the AirPro." (Emphasis added).  The remaining allegations in Paragraph 36 are denied.

37.    The allegations that "AutoEnginuity was aware that this information was protected by AirPro Diagnostics and was aware that the tools used within the AirPro were highly confidential and proprietary to AirPro Diagnostics and how the AirPro worked" are denied.  Defendants further deny that they received or disclosed any purported "Confidential Information" of AirPro.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37 and therefore deny the same.

38.    Admitted that Opus acquired AutoEnginuity.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 38 and therefore deny the same.

39.    Denied.

40.    Denied.

41.    Denied.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

46.    Denied.

47.    Denied.

48.    Denied.  Defendants specifically deny that they ever made a "commitment not to compete" with AirPro.

49.    Admitted that on or about October 21, 2021 Defendants prohibited AirPro from continuing to use the Giotto product but denied that this prohibition was "abrupt[]."  Defendants deny that they "shut down" AirPro's "ability to use the Giotto product" because AirPro wrongfully continued to use the software contained in the Giotto product without a valid license for years and wrongfully obtained substantial revenue thereby.  Defendants further

deny that AirPro developed the Giotto product, as the Giotto product was developed by and is the intellectual property of Defendants.

50.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 and therefore deny the same.

51.    Denied.

52.    Denied.

53.    Denied.

54.    Denied.

55.    Denied.

56.    Denied.

57.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 57 and therefore deny the same.

58.    Denied that AirPro is entitled to recover its attorneys' fees and costs. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 58 and therefore deny the same.

59.    Denied.

## COUNT I
### (Breach of the Noncircumvention Agreement)

60.    Defendants repeat and incorporate by reference all answers and denials contained in Paragraphs 1-59 herein.

61.    Admitted that AirPro purports to bring an action for alleged damages arising from Defendants' alleged breach of the purported Noncircumvention Agreement.  Defendants deny that AirPro has any claim for damages or that Defendants breached the purported Noncircumvention Agreement.

62.    Denied.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Denied.

67.    Denied, including the prayer for relief.

## COUNT II
### (Breach of the Third-Party Beneficiary Agreement)

68.    Defendants repeat and incorporate by reference all answers and denials contained in Paragraph 1-59 herein.

69.    Admitted that AirPro purports to bring an action in the alternative for alleged breach of a purported third-party beneficiary agreement, but denied

that AirPro was a third-party beneficiary of any purported agreement with Defendants.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

75. Denied.

76. Denied, including the prayer for relief.

<u>**COUNT III**</u>
**(Misappropriation of Trade Secrets)**

77. Defendants repeat and incorporate by reference all answers and denials contained in Paragraphs 1-59 herein.

78. The allegations in Paragraph 78 consist of legal conclusions to which no response is required. To the extent a response is required, Chapter 688 of the Florida Statutes is a written document which speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 78 are inconsistent with those contents, Defendants deny the same.

79. The allegations in Paragraph 79 consist of legal conclusions to which no response is required. To the extent a response is required, Section 688.003 of the Florida Statutes is a written document which speaks for itself

and is the best evidence of its contents. Insofar as the allegations in Paragraph 79 are inconsistent with those contents, Defendants deny the same.

80.    The allegations in Paragraph 80 consist of legal conclusions to which no response is required. To the extent a response is required, Sections 688.003 and 688.004 of the Florida Statutes are written documents which speaks for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 80 are inconsistent with those contents, Defendants deny the same.

81.    Denied.

82.    Denied.

83.    Denied.

84.    Denied.

85.    Denied.

86.    Denied.

87.    Denied, including the Prayer for Relief.

<u>**COUNT IV**</u>
**(Permanent Injunctive Relief)**

88.    Defendants repeat and incorporate by reference all answers and denials contained in Paragraphs 1-59 herein.

89.    Admitted that AirPro purports to bring an action for permanent injunctive relief against Defendants but denied that AirPro is entitled to

permanent injunctive relief or any other relief against Defendants.

90.    Denied.  Defendants specifically deny that they have improperly used any of AirPro's purported Confidential Information.

91.    Denied.

92.    Denied.

93.    Denied.

94.    Denied.

95.    Denied.

96.    Denied, including the prayer for relief.

**COUNT V**
**(Fraud)**

97.    Defendants repeat and incorporate by reference all answers and denials contained in Paragraphs 1-59 herein.

98.    Denied.

99.    Denied.

100.    Denied.

101.    Denied.

102.    Denied.  Defendants specifically deny that they made any false statements to AirPro.

103.    Denied.  Defendants specifically deny that they made any false statements to AirPro or that AirPro shared any purported Confidential

Information with them.

104.    Admitted that Defendants prohibited AirPro from continuing to use the Giotto product.    The remaining allegations in Paragraph 104 are denied.

105.    Denied, including the prayer for relief.

### COUNT VI
### (Declaratory Judgment)

106.    Defendants repeat and incorporate by reference all answers and denials contained in Paragraphs 1-59 herein.

107.    Admitted that AirPro purports to bring an action for declaratory judgment against Defendants but denied that AirPro is entitled to a declaratory judgment or any other relief against Defendants.

108.    Denied.

109.    Denied.

110.    Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 110 and therefore deny the same.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied.

115.   Denied, including the prayer for relief.

## COUNT VII
### (Unjust Enrichment)

116.   Defendants repeat and incorporate by reference all answers and denials contained in Paragraphs 1-19, 30 through 39, 46, 47, 49 through 56, and 59 herein.

117.   Denied.

118.   Denied.

119.   Denied.

120.   Denied.

121.   Denied.

122.   Denied.

123.   Denied.

124.   Denied, including the prayer for relief.

## GENERAL DENIAL

Defendants deny that AirPro is entitled to any of the relief sought in the Complaint.  Any and all allegations contained in Plaintiff's Complaint which have not been specifically admitted herein are hereby denied.

## <u>AFFIRMATIVE AND ADDITIONAL DEFENSES</u>

Defendants, having answered the allegations in the Complaint, hereby set forth their affirmative and additional defenses to AirPro's allegations and claims as follows:

### <u>FIRST DEFENSE</u>
### (Waiver, Estoppel, Ratification, Acquiescence, and Consent)

AirPro's claims are barred in whole or in part under the doctrines of waiver, estoppel, ratification, acquiescence, and/or consent because, among other reasons, AirPro knew about and accepted Opus's lawful competition, including its use of the Giotto Software, for years before belatedly claiming in 2022 that Opus's remote scanning business was stolen from AirPro back in 2017. Also, to the extent AirPro provided any purported "Confidential Information" to Defendants, AirPro expressly or impliedly assented to Defendants' use of that information for their own commercial purposes (and any other purpose) and/or by its conduct led Defendants to believe that there were no limitations or restrictions on Defendants' use of the purported "Confidential Information" allegedly provided by AirPro to Defendants. Further, to the extent provided, AirPro knew that the purported "bug reports" AirPro voluntarily provided to Defendants (for AirPro's own benefit) with respect to the Giotto Software would be incorporated into the Giotto Software

and used to improve the Software for all users of the Giotto Software, not just for AirPro.

AirPro's argument that there was somehow an unwritten understanding or agreement between the parties that Defendants could use AirPro's "bug reports" only to improve instances and versions of the Giotto Software used by AirPro – but had to leave bugs or other issues with the Software in place with respect to Defendants' own use of the Giotto Software or for others' use of the Giotto Software – is nonsensical.  No reasonable person in the position of Defendants would have believed or understood that such a purported limitation existed on Defendants' use of AirPro's "bug reports."  In fact, AirPro's employee Eric Applequist – who provided the purported bug reports to Defendants on behalf of AirPro – has confirmed he was unaware of any restriction on Defendants' ability to use the information AirPro purportedly provided to Defendants in the form of "bug reports."

AirPro's claims are also barred because AirPro filed a lawsuit on December 8, 2022 against Defendants in the U.S. District Court for the Eastern District of Michigan, Case No. 22-12969-LVP-EAS ("Michigan Lawsuit"), and did not file the claims now belatedly asserted against Defendants, despite those claims arising out of the same nucleus of operative facts as the claims litigated in the Michigan Lawsuit.  AirPro also never asserted that Defendants could not use the Giotto Software (their own

software) for commercial purposes other than with respect to AirPro, despite being aware for years that Defendants have always used the Giotto Software for a number of commercial purposes outside of Defendants' business relationships with AirPro. Moreover, AirPro never contended that Defendants had wrongfully used any of AirPro's purported "Confidential Information" until Defendants terminated AirPro's license to use the Giotto Software. AirPro's claims are barred.

## SECOND DEFENSE
### (Equitable Estoppel / Promissory Estoppel)

AirPro's claims are barred by the doctrine of equitable estoppel because, among other reasons, (1) AirPro represented to Defendants that Defendants could use the purported bug reports AirPro allegedly provided to Defendants to improve the Giotto Software and incorporate associated fixes into new versions of the Giotto Software to be used by Defendants for commercial purposes; (2) Defendants relied on these representations by addressing the purported bug reports allegedly provided by AirPro; and (3) AirPro now belatedly and in bad faith claims that the bug reports purportedly provided to Defendants were somehow AirPro's "Confidential Information" that could not be used by Defendants.

## THIRD DEFENSE
### (Judicial Estoppel)

AirPro's claims are barred by the doctrine of judicial estoppel because, among other reasons, AirPro successfully maintained in the Michigan Lawsuit against the same Defendants, that the "bug reports" and the other purported "Confidential Information" AirPro alleges it shared with Defendants was not confidential or otherwise protected.  AirPro now alleges that this purported "Confidential Information" allegedly shared with Defendants was confidential to the prejudice of Defendants.

## FOURTH DEFENSE
### (Rule Against Splitting)

AirPro's claims are barred by the Rule against Splitting Causes of Action for the reasons stated in Defendants' Rule 12(b)(6) Motion to Dismiss. (ECF No. 9). Specifically, AirPro's purported claims in this action arise out of the same nucleus of operative facts as AirPro's claims alleged against Defendants in the Michigan Lawsuit and the record will show significant overlap in the evidence presented in both cases.  This action is an impermissible attempt by AirPro to pivot to new legal theories that AirPro failed to assert in the Michigan Lawsuit.  AirPro's claims should be dismissed and appropriate sanctions should be awarded against AirPro for its vexatious litigation tactics.

## FIFTH DEFENSE
### (Economic Loss Rule)

AirPro's tort claims are barred by the economic loss rule and/or the independent tort doctrine because AirPro's purported claims, if any, are governed by contract law.

## SIXTH DEFENSE
### (Statutes of Limitations / Statutes of Repose)

AirPro's claims are barred by the applicable statutes of limitations and/or statutes of repose.

## SEVENTH DEFENSE
### (Laches)

AirPro's claims are barred by the doctrine of laches because, among other reasons, AirPro has had knowledge/notice of Defendants' alleged conduct at issue in this action for many years (and well before December 8, 2022); AirPro filed the Michigan Lawsuit against Defendants on December 8, 2022 and did not assert any of the claims AirPro belatedly asserts in this action; Defendants have been prejudiced by being forced to defend the new claims filed in this action which are based on the same alleged conduct by Defendants that was the subject of the Michigan Lawsuit; and Defendants litigated the Michigan Lawsuit for years believing that AirPro had asserted all of its purported claims against Defendants and that AirPro would not assert the purported rights on which AirPro now bases this new action.

## EIGHTH DEFENSE
### (Costs and Attorneys' Fees)

AirPro has failed to set forth any allegations that could support entitlement to costs or attorneys' fees.

## NINTH DEFENSE
### (Good Faith)

AirPro's claims are barred by its failure to act at all times in good faith and in accordance with reasonable commercial standards.

## TENTH DEFENSE
### (Set-Off)

To the extent Defendants are determined to be liable to AirPro in any amount, which liability is expressly denied, Defendants are entitled to a set-off from such amount equal to the damages that have been incurred by Defendants as a direct and proximate result of AirPro's unlawful conduct as described in Defendants' Counterclaims below.

## ELEVENTH DEFENSE
### (Recoupment)

To the extent Defendants are determined to be liable to AirPro in any amount, which liability is expressly denied, Defendants are entitled to recoupment of any amounts determined to be owed, because on information and belief AirPro is liable to Defendants as described in Defendants' Counterclaims below.

## TWELFTH DEFENSE
### (Contractual Terms)

Defendants plead the terms and conditions of all applicable agreements between the parties, written or otherwise, and incorporate those terms, conditions, and provisions by reference herein as a bar to any recovery and relief sought by AirPro in this case.

## THIRTEENTH DEFENSE
### (Unclean Hands)

AirPro is barred from recovery by the doctrine of unclean hands for, among other reasons: (1) unlawfully misrepresenting the Giotto Software; (2) lending, leasing, sublicensing, and redistributing the Giotto Software to third parties through AirPro's practice of allowing its customers to perform "Self Scans"; (3) making statements that diagnostic services performed using the Giotto Software were equivalent to the OE diagnostic system; (4) subjecting Defendants to potential third-party liability due to AirPro's misuse and misrepresentation of the Giotto Software; (5) willfully and maliciously misappropriating, converting, and violating Defendants' intellectual property rights in and to the Giotto Software; (6) in bad faith asserting that AirPro has an ownership interest in the Giotto Software; (7) asserting purported claims under the purported agreements between the parties in bad faith; (8) deceiving AirPro customers as to the nature of the services AirPro offers to prioritize

AirPro's business profit at the expense of vehicular and human safety; and (9) in such other and further ways as may be shown during the course of discovery.

## FOURTEENTH DEFENSE
### (Failure to Mitigate)

To the extent Defendants are determined to be liable to AirPro in any amount, which liability is expressly denied, upon information and belief, AirPro failed to mitigate its damages, and such failure to mitigate operates as a bar in whole or in part to some or all of the recovery sought by AirPro in this matter.

## FIFTEENTH DEFENSE
### (In Pari Delicto)

AirPro's claims are barred in whole or in part by the equitable doctrine of *In Pari Delicto* for, among other reasons: (1) unlawfully misrepresenting the Giotto Software; (2) lending, leasing, sublicensing, and redistributing the Giotto Software to third parties through its practice of allowing its customers to perform "Self Scans;" (3) making statements that diagnostic services performed using the Giotto Software were equivalent to the OE diagnostic system; (4) subjecting Defendants to potential third-party liability due to AirPro's misuse and misrepresentation of the Giotto Software; (5) willfully and maliciously misappropriating, converting, and violating Defendant's intellectual property rights in and to the Giotto Software; (6) in bad faith asserting that AirPro has an ownership interest in the Giotto Software; (7)

asserting purported claims under the purported agreements between the parties in bad faith; (8) deceiving AirPro customers as to the nature of the services AirPro offers to prioritize AirPro's business profit at the expense of vehicular and human safety; and (9) in such other and further ways as may be shown during the course of discovery.

## SIXTEENTH DEFENSE
**(Plaintiff's Own Acts/Failure of Performance)**

AirPro's claims are barred or reduced by its failure to perform all obligations and conditions precedent, concurrent, or subsequent required under the terms of the purported Noncircumvention Agreement.

## SEVENTEENTH DEFENSE
**(Res Judicata)**

AirPro's claims are or will be barred by the doctrine of res judicata due to the nature/status of the Michigan Lawsuit and/or further developments in the Michigan Lawsuit.

## EIGHTEENTH DEFENSE
**(Collateral Estoppel / Issue Preclusion)**

AirPro's claims are or will be barred by the doctrine of collateral estoppel (issue preclusion) due to the nature/status of the Michigan Lawsuit and/or further developments in the Michigan Lawsuit.

## NINETEENTH DEFENSE
**(Unconscionability)**

AirPro's interpretation of the purported Noncircumvention Agreement would confer upon AirPro an unjust and undeserved advantage that it would be inequitable for AirPro to be permitted to enforce.

## TWENTIETH DEFENSE
**(Illegality of the purported Noncircumvention Agreement)**

AirPro's interpretation of the purported Noncircumvention Agreement to prohibit Defendants from "directly competing with AirPro Diagnostics in the collision repair industry" renders the Agreement an illegal contract in restraint of trade or commerce that is unlawful under Sections 542.18 and 542.19 of the Florida Statutes as well as federal anti-trust laws.  Similarly, AirPro's interpretation of the Agreement to require that Defendants only improve their Giotto Software for AirPro but not for themselves or for any other customer renders the Agreement an illegal contract in restraint of trade or commerce that is unlawful under Section 542.18 of the Florida Statutes.  Accordingly, the purported Noncircumvention Agreement should be declared to be an illegal contract that was and is null and void *ab initio*.

## TWENTY-FIRST DEFENSE
**(Unreasonableness of the Purported Noncircumvention Agreement)**

The purported covenants contained in the purported Noncircumvention Agreement are unreasonable and unenforceable because, among other reasons,

they are unlimited as to time, scope, and geographic area, and are otherwise not reasonably necessary to protect AirPro's purported business interests.

## TWENTY-SECOND DEFENSE
### (Noncircumvention Agreement Bars Unjust Enrichment Claim)

To the extent it is determined that the Noncircumvention Agreement is a valid and enforceable contract, AirPro's claim for unjust enrichment is barred.

## TWENTY-THIRD DEFENSE
### (Gift)

AirPro provided the purported "Confidential Information" at issue to Defendants without expecting to receive something in return and nothing is unjust about Defendants' alleged use of such a gift.

## TWENTY-FOURTH DEFENSE
### (Payment)

AirPro received the benefit of the purported benefit it conferred upon Defendants by providing Defendants with its purported "Confidential Information" because, among other reasons, AirPro received the benefit of bug fixes and improved versions of the Giotto Software based on AirPro's bug reports (to the extent AirPro's bug reports contributed to the improvement of the Giotto Software in any way).

## TWENTY-FIFTH DEFENSE
### (Failure to State a Claim)

AirPro's Complaint fails to state a claim because, among other reasons, the Complaint fails to set forth factual allegations in support of AirPro's purported fraud claim with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.

## TWENTY-SIXTH DEFENSE
### (Reservation of Rights)

To the extent AirPro's Complaint fails to set forth the legal and factual bases for AirPro's claims with sufficient specificity, clarity, or completeness to allow Defendants to identify accurately all of their applicable or potentially applicable defenses, Defendants expressly reserve the right to amend the defenses pled above and/or assert additional defenses as appropriate.

## COUNTERCLAIMS

Defendant Opus IVS, Inc. ("Opus"), by and through its undersigned attorneys, asserts the following Counterclaims against AirPro Diagnostics, LLC ("AirPro"), alleging and saying as follows:

### THE PARTIES

1.      Opus is a corporation organized and existing pursuant to the laws of the State of Delaware, with a principal place of business in Dexter, Michigan.

2.    AutoEnginuity, LLC ("AutoEnginuity") was a limited liability company organized and existing under the laws of the State of Arizona with a principal place of business in Mesa, Arizona.

3.    On or about January 2, 2020, Opus (through Drew) acquired AutoEnginuity.

4.    On December 31, 2020, Drew merged into Opus. A true and accurate copy of the Certificate of Merger is attached hereto as **Exhibit B**.

5.    On December 31, 2020, AutoEnginuity merged into Opus. *See* Ex. A.

6.    As part of the mergers of AutoEnginuity and Drew into Opus, AutoEnginuity and Drew assigned their intellectual property rights and commercial agreements to Opus, including their license agreements with AirPro regarding the Giotto Software and intellectual property rights in and to the Giotto Software.

7.    Upon information and belief, AirPro is a limited liability company with a principal place of business located in Jacksonville, Florida.

8.    Upon information and belief, none of AirPro's members are citizens of Michigan or Delaware.

## JURISDICTION AND VENUE

9.    This Court has personal jurisdiction over the parties because, *inter alia*, both parties have consented to this Court's jurisdiction.

10.    This Court has subject matter jurisdiction over this action because there is complete diversity of citizenship between Opus and AirPro, and the amount in controversy exceeds $75,000, exclusive of interest and costs consistent with 28 U.S.C. § 1332.

11.    This Court has subject matter jurisdiction over the Counterclaims relating to the Copyright Act (17 U.S.C. §§ 101, 501) pursuant to 28 U.S.C. § 1331 and 28 U.S.C § 1338(a).

12.    This Court has subject matter jurisdiction over the state law Counterclaims under 28 U.S.C. § 1367.

13.    Venue for this action is proper in this district and division consistent with 28 U.S.C. §§ 1391(b)(2)-(3); 1400(a).

## FACTS

## Factual Background

14.    Opus is an automotive technology company that provides intelligent vehicle support through an array of automotive diagnostic and programming products and services.

15.    AutoEnginuity was a manufacturer and developer of aftermarket automotive diagnostic software and hardware.

16.    Motor vehicles have become increasingly technologically advanced, and most newer car models contain many (approximately 70-100) computer modules, or electronic control units ("ECUs"), which contain data

regarding the health of the vehicle's components. Opus' suite of software programs, hardware offerings, and automotive services provide automotive diagnostic capabilities to customers, allowing automotive technicians to accurately and efficiently identify actual or potential issues with a vehicle.

17.    Opus sells its automotive diagnostic tools and services to two broad and overlapping sets of customers, broadly referred to as "mechanical sales" and "collision sales."

18.    Collision sales involve the marketing and provision of diagnostic tools and services to automotive collision repair businesses or "shops." Mechanical sales involve the marketing and provision of a different set of diagnostic and programming tools and services to automotive parts dealers and maintenance repair shops.

19.    Opus and AirPro are competitors with respect to both collision and mechanical sales, and Opus and AirPro compete to provide their services to the same sets of customers with respect to collision and mechanical sales.

20.    Opus and AirPro are both providers of remote automotive diagnostic services.

21.    Per AirPro, Opus is AirPro's biggest competitor.

22.    Opus and AirPro use "scan tools" to provide their remote automotive diagnostic services.

23.    Scan tools are electronic tools that consist of software that allow automotive repair technicians to interface with a vehicle's computer modules, allowing them to remotely identify and diagnose issues.

24.    In the automotive repair industry, there are two categories of scan tools: (1) Original Equipment Manufacturer ("OEM" or "OE") scan tools and (2) aftermarket scan tools. These tools are differentiated in part by the software they use: (1) OEM scan tools use OEM software; and (2) aftermarket software scan tools use aftermarket software.

25.    OEM software is specific to a manufacturer's line of vehicles, must meet warranty repair guidelines as set by the OEM, has increased levels of exposure to testing for those vehicles, increased model year coverage, and greater access to feedback for making improvements.  OEM software is deployed to OEMs' franchised dealerships, used on brand new model year vehicles, and often touches millions of vehicles per month across the globe. OEM software is also used to perform safety campaigns and recalls.  And it has extended features beyond scanning such as reprogramming.

26.    On the other hand, aftermarket software is not specific to a particular manufacturer's line of vehicles and is not required to meet warranty repair guidelines as set by the OEM.  Further, because aftermarket software is not particular to a manufacturer's line of vehicles, it does not have the same level of exposure to testing, model coverage, and access to feedback for

improvements that the OEM software has for a particular OEMs' vehicles. Because it is not developed by an OEM and is not tested and validated on every brand-new model year and trim combination, aftermarket software developers often have delays accessing licensed data from the OEMs, or in some cases have no licensed data at all, and the aftermarket software must be reverse engineered.

27.    Diagnostic scan tool software is primarily used to conduct "pre-scans" and "post-scans" of a vehicle that is being repaired at an automotive repair shop or dealership.  "Pre-scans" are conducted to determine what in the vehicle needs to be repaired, and "post-scans" are conducted after repairs are completed to ensure the repair was successful and that there are no remaining issues with the vehicle.

28.    To represent a scan tool as an OEM scan tool is to represent that it is a product that uses OEM software, is associated with the original manufacturer and a particular brand of vehicles, is endorsed by the original manufacturer, and has the benefit of the increased levels of exposure testing and access to feedback for improvements that result from the narrow focus of OEM scan tools and the OEM-specific standards they must meet.

29.    AutoEnginuity's Giotto Software is an industry-leading aftermarket diagnostic scan tool software or computer program that allows technicians to remotely diagnose issues with a vehicle.

30.     Jay Horak ("Horak"), former owner of AutoEnginuity, developed the Giotto Software on behalf of AutoEnginuity with the help of Jason Blackston ("Blackston"), former Vice President of Engineering at AutoEnginuity.

31.     Horak is now the Chief Technology Officer at Opus, and Blackston is now the Vice President of Global Diagnostics at Opus, where they continue to develop and improve the Giotto Software.

32.     The Giotto Software is an aftermarket software because it was created by AutoEnginuity (and later versions by Opus), which are not OEMs like Toyota or Ford, for example.

33.     AutoEnginuity licensed the Giotto Software to others as part of its business before AutoEnginuity merged into Opus on December 31, 2020.

34.     AutoEnginuity and Opus (after AutoEnginuity merged into Opus) have invested tremendous effort and expense in creating and developing the Giotto Software for the purpose of diagnosing and facilitating the repair of vehicles both nationally and internationally.

35.     Opus holds all rights, including intellectual property rights and copyright registrations, in and to the Giotto Software.

36.     The United States Copyright Office has issued copyright registration certificate TX 9-481-447 to Opus for the work titled "Giotto 18.0." A copy of the registration certificate is attached hereto as **Exhibit C**.

31

37.    Giotto 18.0 incorporated all versions of the Giotto Software released prior to version 18.0 and was based on all versions of the Giotto Software released prior to version 18.0.

38.    The material added to the Giotto Software in version 18.0 included new added functionality for use with model year 2020 vehicles, fixed scanning issues related to functionality for select earlier model year vehicles, and added scanning functionality for select earlier model year vehicles.

39.    All subsequent versions of the Giotto Software, including versions 19.0, 19.1, 19.2, 19.3, and 20.0, incorporated and were based on Giotto 18.0 as well as all prior versions of the Giotto Software.

40.    Opus is also the owner of copyright registration number TX 9-507-507 for the work titled "Giotto 19.1."  A copy of a summary of Registration TX 9-507-507 available on the Copyright Public Records Systems is attached hereto as **<u>Exhibit D</u>**.

41.    Giotto 19.1 incorporated and was based on all versions of the Giotto Software released prior to version 18.0, version 18.0 that is the subject of Registration TX 9-481-447, and versions of the Giotto Software released between version 18.0 and version 19.1.

42.    The material added to the Giotto Software in version 19.1 included improvements to the functionality for use with model year 2021 vehicles, and

improved enhanced support for Hyundai/Kia, Mercedes Benz and Nissan vehicles.

43.    Opus is also the owner of copyright registration number TX 9-508-521 for the work titled "Giotto 19.2."

44.    Giotto 19.2 incorporated and was based on all versions of the Giotto Software released prior to version 18.0, version 18.0 that is the subject of Registration TX 9-481-447, versions of the Giotto Software released between version 18.0 and version 19.1, and version 19.1 that is the subject of Registration TX 9-507-507.

45.    The material added to the Giotto Software in version 19.2 includes improvements to the functionality for use with model year 2021 vehicles, and improved enhanced support for BMW, Land rover and Porsche vehicles, as well as for Volkswagen AG vehicle test systems.

46.    Opus is also the owner of copyright registration number TX 9-507-862 for the work titled "Giotto 19.3."  A copy of a summary of Registration TX 9-507-862 available on the Copyright Public Records System is attached hereto as **Exhibit E**.

47.    Giotto 19.3 incorporated and was based on all versions of Giotto released prior to version 18.0, version 18.0 that is the subject of Registration TX 9-481-447, versions of Giotto released between versions 18.0 and 19.1,

version 19.1 that is the subject of Registration TX 9-507-507, and version 19.2 of the Giotto Software for which Opus has applied for registration.

48.    The material added to the Giotto Software in version 19.3 included new added functionality for use with model year 2021 vehicles, and enhanced support for Peugeot S.A. vehicles, as well as provided support for a J-2534 device to enable technicians to run Giotto for diagnostics and OE software for programming on a single hardware device.

49.    Opus is also the owner of copyright registration number TX 9-507-431 for the work titled "Giotto 20.0." A copy of a summary of Registration TX 9-507-431 available on the Copyright Public Records Systems is attached hereto as **Exhibit F**.

50.    Giotto 20.0 incorporated and was based on all versions of the Giotto Software released prior to version 18.0, version 18.0 that is the subject of Registration TX 9-481-447, versions of Giotto released between version 18.0 and version 19.1, version 19.1 that is the subject of Registration TX 9-507-507, version 19.2 of the Giotto Software for which Opus has applied for registration, and version 19.3 of the Giotto Software that is the subject of Registration TX 9-507-862.

51.    The material added to the Giotto Software in version 20.0 included new added functionality for use with model year 2022 vehicles, and improved

enhanced support for Peugueot S.A., Volvo, Audi, Lamborghini, Porsche and Volkswagen AG vehicles, as well as updated ADAS support.

52.    Opus currently licenses the Giotto Software and has licensed the Giotto Software since AutoEnginuity merged into Opus.

53.    In 2019, Drew Technologies, Inc. ("Drew"), Opus' predecessor entity, began using the Giotto Software as the aftermarket diagnostic software on its "DriveCrash" scan tool after AutoEnginuity ported the Giotto Software to Drew's CarDAQ J-2534 Vehicle Communication Interfaces ("VCIs").

54.    J-2534 is an interface standard designed by the Society of Automotive Engineers ("SAE") and mandated by the United States Environmental Protection Agency for vehicle electronic control unit ("ECU") reprogramming.

55.    Drew was a manufacturer of collision and mechanical repair scan tools, automotive diagnostic tools, and J-2534 devices, as well as a provider of remote automotive diagnostic services.

56.    Drew has existed since 1998. Drew has been heavily involved with SAE regarding the creation of the J-2534 standard.

57.    Mike Drew, the founder of Drew, worked with the EPA, automakers, and the automotive industry to develop the J-2534 standard which allowed automakers to create diagnostic software that could be licensed

to independent repair shops and could run on a Windows PC by connecting to vehicles through a standardized J-2534 VCI.

58.     Opus' current President, Brian Herron ("Herron"), held various positions at Drew from 2005-2015.  Herron served as the President of Drew from 2015-2020.

59.     From 2005-2020, Herron, Mike Drew, and the Drew team focused on the creation of the J-2534 standard, its adoption by automakers, its support by the industry through partners, the legislation of J-2534 through Right to Repair laws, and the overall success of the use of J-2534 not only as an automotive reprogramming interface but also as a complete automotive diagnostics interface.

60.     Prior to 2010, Herron made significant efforts to promote the adoption of J-2534, particularly with respect its use as an automotive diagnostics interface.

61.     Prior to 2010, Herron had many conversations with aftermarket diagnostic companies asking them to implement a diagnostic solution that utilized the J-2534 interface.  These companies included Snap-on, Bosch, Autel, EASE Diagnostics, Autologic, Launch, Tactrix, and Palmer Performance.

62.   Upon information and belief, the first scan tool to use aftermarket diagnostic software in conjunction with a J-2534 VCI was Palmer Performance's OBD scan tool beginning in or around 2007.

63.   In 2015, Opus Inspection, Inc. ("Opus Inspection") acquired Drew.

64.   After the acquisition of Drew by Opus Inspection, Herron led the efforts within Opus Inspection (as President of Drew) to build an industry-leading diagnostics and remote services platform that led to the creation of Opus.

65.   Opus (through a related entity) acquired Autologic Diagnostics Ltd. ("Autologic") in 2017, a company that had built an aftermarket European diagnostic scan tool and had been performing remote diagnostic services for their customers for more than ten (10) years.

66.   Also in 2017, Opus (through a related entity) acquired MVDS, LLC ("Farsight"), a company that had built a wide range of coverage for remote diagnostic assistance using OEM scan tools.

67.   In 2019, Opus (through Drew) acquired Bluelink Diagnostic Solutions Inc. ("Bluelink"), a company which had developed a patented and unique automotive remoting technology that went beyond simple TeamViewer remote desktop technologies typically used to provide remote automotive diagnostic services.  Bluelink's advanced remoting technology was patented in 2009 and is used by Opus to provide remote automotive diagnostic services.

68.    After the acquisition of AutoEnginuity in 2020, Opus acquired AutoTechcelerators, a leader in ADAS identification, calibration and ADAS safety system verification software through their popular ADAS CoPilot™, Calibration CoPilot™ and Test Drive CoPilot™ product suites.

69.    Drew and AutoEnginuity had a long-running business relationship that was formed long before Opus (Drew) acquired AutoEnginuity in 2020. Drew and AutoEnginuity had discussed the idea of porting the Giotto Software to a J-2534 VCI since 2006 as part of broader discussions regarding ways in which their businesses could work together.

70.    In fact, in 2013, AutoEnginuity discussed its plans to port the Giotto Software to a J-2534 VCI in an interview with Motor Age Magazine that has been and currently is publicly available on Youtube.

71.    Despite Opus producing this 2013 Youtube video to AirPro in discovery in the Michigan Lawsuit, AirPro alleges in its Complaint that it was AirPro's "idea and invention . . . to run the Giotto software through the J2534 [VCI]" and that AutoEnginuity/Opus are wrongfully using that "idea and invention" in breach of the purported Confidentiality and Noncircumvention Agreement between AutoEnginuity and CompuFlash dated November 14, 2016 ("Purported Agreement"). (*See* ECF 1-2 ¶ 52). Given AirPro was not even formed until 2016, nor was the Purported Agreement executed until 2016, AirPro utterly lacks any good faith basis for making this allegation.

72.    During and prior to 2019, Drew used OEM diagnostic software to successfully provide remote diagnostic services.

73.    During and prior to 2019, Drew also used an aftermarket diagnostic scan tool software, the "Autologic" software ("Autologic Software"), to successfully provide remote diagnostic services.

74.    In 2020, after its acquisition of AutoEnginuity, Opus took the code from the Giotto Software and combined it with the code from its purchase of intellectual property rights in and to the Autologic Software to form a new aftermarket software with the benefits of both the Giotto Software and the Autologic Software.

75.    For example, the Autologic Software had enhanced coverage for European vehicles, while the Giotto Software had enhanced coverage for American vehicles.

76.    Since late 2020, the Giotto/Autologic combined software ("Giotto/Autologic Software") has been used as the aftermarket software for Opus' provision of remote diagnostic services to the collision repair market.

77.    The Giotto/Autologic Software was used in Opus' DriveCrash product and is currently used in Opus' "DriveSafe" product, which are the tools Opus has used to serve the remote collision scanning services market and thus compete with AirPro.  It is also used in many other products, including the

Giotto Software offered for sale on Amazon, the DrivePro1 and DrivePro2, and other Opus offerings.

78.    Opus now holds over 100 patents pending for technologies related to scanning, diagnostics, remote vehicle technology, collision workflows, Advance Driver Assistance Systems ("ADAS") services, and much more.

### AirPro's and Opus' Business Relationships, and Airpro's Licensing and (Mis)Use of the Giotto Software.

79.    In April 2016, CompuFlash, LLC ("CompuFlash") was an automotive reprogramming assist company that performed module reprogramming of vehicles over the Internet.

80.    In April 2016, CompuFlash disclosed its intent to use the Giotto Software to AutoEnginuity.  CompuFlash further disclosed that it was planning to offer remote automotive scanning services as well or, in other words, remote automotive diagnostic services to the collision repair market.

81.    In April 2016, the Giotto Software was exactly what CompuFlash needed to be able to offer remote automotive diagnostic services to the collision repair market, given the Giotto Software had been used by automotive collision repair shops for over a decade, since the early 2000's.

82.    Later in 2016, AirPro, a company that had a business relationship with CompuFlash, began obtaining licenses to the Giotto Software from AutoEnginuity which, at that time, were governed by an End User License

Agreement ("Old EULA").  A true and accurate copy of the Old EULA is attached hereto as **Exhibit G**.

83.    In conjunction with its purchases of licenses to the Giotto Software, AirPro purchased "Pro-line" VCIs from AutoEnginuity through which to run the Giotto Software.

84.    Also in 2016, AirPro began purchasing CarDAQ J-2534 VCIs from Opus through its subsidiary Drew.

85.    AirPro used both Drew's CarDAQ J-2534 VCIs (in conjunction with software other than the Giotto Software) and AutoEnginuity's Giotto Software (in conjunction with AutoEnginuity's "Pro-line" VCIs) as part of its "Airpro" device, which is the device AirPro uses to provide its remote diagnostic scanning services to its customers.

### Early 2017 "Project Waterfall" Merger Discussions between Drew (Opus) and AirPro.

86.    In February 2017, Opus (through Drew) and AirPro began to discuss potential synergies working together, which led to "Project Waterfall" discussions of potentially combining their respective remote scanning businesses serving the automotive collision repair market through the formation of a new business entity.  Over the ensuing weeks, the parties tossed around some ideas.

87.    Opus and AirPro worked together to create projections for what a combined business might look like and put together draft terms for a combined collision scanning business.

88.    Preliminary draft LOIs were exchanged, but the Project Waterfall discussions were ultimately short-lived.  They quickly fell apart around May 2017 due to the clear inability to reach an agreement as to price and structure.

89.    Opus and AirPro continued their business relationship as normal from 2017-2020 until the relationship became strained when Opus learned that AirPro was misrepresenting AutoEnginuity's/Opus' Giotto Software as OEM software.

### The Ford-AirPro Lawsuit

90.    In February 2020, Opus learned that Ford Motor Co. ("Ford") and a related entity had filed a lawsuit against AirPro in the U.S. District Court for the Eastern District of Michigan, Case No. 2:20-cv-10518-GCS ("Ford-AirPro Lawsuit").

91.    In the Ford-AirPro Lawsuit, Ford alleged and ultimately proved that AirPro had violated a number of Ford's intellectual property rights, including Ford's Copyright TX 8-840-242, which is Ford's copyright registration for its OEM automotive diagnostic software ("Ford Diagnostic Software") that AirPro licensed from Ford.

42

92.     Ford also claimed and ultimately proved in the Ford-AirPro Lawsuit that AirPro had falsely represented that AirPro's customers were receiving a Ford OEM scan through use of the aftermarket Giotto Software that AutoEnginuity had licensed to AirPro.

93.     In addition to its claim for copyright infringement, Ford also asserted claims against AirPro for false designation of origin, unfair and deceptive trade practices in violation of Michigan statutory and common law and breach of contract.

94.     Ford's trademark infringement claim was specifically premised on AirPro's use of precise replicas of Ford's trademarks to pass of AutoEnginuity's aftermarket software as Ford Diagnostic Software.

95.     Ford's breach of contract claim was based on AirPro's violation of the End User License Agreement applicable to the Ford Diagnostic Software ("Ford EULA").

96.     In the Ford-AirPro Lawsuit, AirPro specifically acknowledged that it agreed to the terms of the Ford EULA each time it uploaded the Ford Diagnostic Software onto its scan tool.

97.     In granting partial summary judgment as to liability on Ford's breach of contract claim, the Ford-AirPro Court explained that – by choosing to use the Ford Diagnostic Software – AirPro became bound by the terms of the EULA governing the Ford Diagnostic Software.

98.    In granting partial summary judgment as to liability on Ford's trademark infringement claim, the Ford-AirPro Court found that AirPro had unlawfully used Ford Marks in representing AutoEnginuity's Giotto Software – an aftermarket software – as OEM software.

99.    The Ford-AirPro Court concluded: "It cannot be disputed that . . . AirPro set out to identify Ford as one source of OEM software used on its scan tool, not just to claim that its scan tool is compatible with Ford's Diagnostic Software."

100.    AirPro's trademark infringement of Ford's Marks necessarily entailed a representation of AutoEnginuity's Giotto Software as OEM software.

101.    But the Giotto Software is an aftermarket automotive diagnostic software, not an OEM automotive diagnostic software.

102.    Nevertheless, AirPro inaccurately and unlawfully advertised and marketed the Giotto Software as an OEM automotive diagnostic software in an effort to successfully mislead consumers and unfairly compete with Opus.

103.    For example, each of AirPro's scan reports or "Certificates of Scan" from 2018 to 2021 contained the following statement: "*AirPro utilizes embedded OEM software with OEM compliant interfaces which meet or exceed OEM requirements*." These Certificates of Scan were sent to AirPro's customers after every diagnostic scan performed by AirPro, despite the fact

that AirPro performed approximately 96% of its diagnostic scans using the Giotto Software during that timeframe.

104.   Other documents were ultimately brought to Opus' attention via the Ford-AirPro Lawsuit showing AirPro's misrepresentation of the Giotto Software as OEM.  For example, the Ford-AirPro Lawsuit revealed that AirPro advertised its automotive diagnostic services as follows: "We only use OEM licensed software to get the job done right;" "ALL services provided [by AirPro] utilize OEM software and technical service information which meet or exceed OEM requirements!".

105.   AirPro chose to misrepresent the Giotto Software and the nature of its scanning services provided using aftermarket diagnostic software as OEM software because AirPro considers aftermarket to be a "dirty word," a "bad word" in the collision repair industry associated with "inferiority."

106.   Concerned by Ford's allegations against AirPro in the Ford-AirPro Lawsuit (which were ultimately proven), on March 11, 2020, Opus sent AirPro a letter (the "March 11 Letter") expressing its concerns regarding AirPro's use and representations of the Giotto Software.

107.   Opus expressed its concern in the March 11 Letter that AirPro was falsely representing to its customers and potential customers that: (1) a scan performed using the Giotto Software is originating from "OEM Scantool

Software"; and (2) a scan performed using the Giotto Software is "an OE scan or equivalent to an OE scan."

108.   AirPro never responded to the March 11 Letter.

109.   While the Giotto Software is among the best in the industry with comprehensive coverage, AutoEnginuity did not and has never represented that the Giotto Software is OEM software, that the Giotto Software will achieve the same results as OEM software, or that the Giotto Software is otherwise equivalent to OEM software.

110.   In other words, Opus and AutoEnginuity lawfully and accurately market their products and services.

111.   Opus and AutoEnginuity similarly require that licensees of their products market those products lawfully.

112.   AutoEnginuity implemented a new End User License Agreement ("EULA") for the Giotto Software on December 1, 2020.  A true and accurate copy of the EULA is attached hereto as **Exhibit H**.

113.   AutoEnginuity provided licensees of the Giotto Software, including AirPro, with notice of the EULA through major software updates to the Giotto Software.

114.   During the installation process for major updates to the Giotto Software, a dialog box appears:



115.  The dialog box contains a message that states: "Please read the following license agreement carefully."  It then provides a full copy of the EULA for the end user to review.

116.  The beginning of the EULA conspicuously states in all caps:

IN ORDER TO USE THE SOFTWARE YOU MUST ACCEPT ALL OF THE TERMS OF THIS AGREEMENT. AFTER READING THE TERMS, IF YOU AGREE TO THEM, PLEASE INDICATE YOUR DECISION BY CLICKING ON "I AGREE" ON THE SERVICE REGISTRATION PAGE.

117.  The end user can then either accept the terms or reject the terms of the EULA.

118.   While the end user is free to accept or reject the terms of the EULA, the installation of major updates to the Giotto Software is conditional on the end user accepting the EULA and thereby assenting to abide by its terms.

119.   End users of the Giotto Software are required to accept the terms of the EULA prior to the file transfer for any major software update installation.

**AirPro Repeatedly Agrees to the Terms of the EULA.**

120.   AutoEnginuity, and Opus after AutoEnginuity merged into Opus, typically created four (4) major software updates per year for the Giotto Software.

121.   AirPro paid annual fees to AutoEnginuity and Opus for access to these software updates.

122.   AirPro installed and used each major software update AutoEnginuity and Opus provided to AirPro from 2016 to 2021.

123.   When AutoEnginuity or Opus made a new software update available, AirPro would receive notification of the new updates from AutoEnginuity or Opus.  And to install the updates, AirPro had to review and accept the EULA.

124.   On December 24, 2020, AutoEnginuity sent all licensees of the Giotto Software, including AirPro, a major update to the Giotto Software entitled "Giotto (19.0)."   The description for this update was "Giotto®

introduces the 21 MY support and continues to improve enhanced BMW, Porsche, and J2534 hardware support."

125.  Upon information and belief, AirPro received and installed the Giotto (19.0) software update for each AirPro device that used the Giotto Software.

126.  When installing the Giotto (19.0) software update, AirPro accepted the terms of the EULA.

127.  By repeatedly using Giotto (19.0) and subsequent versions of the Giotto Software, AirPro assented to the terms of the New EULA.

128.  When AutoEnginuity merged into Opus on December 31, 2020, AutoEnginuity assigned its rights to the Giotto Software and rights under the EULA to Opus.

129.  Accordingly, Opus sent additional updates to the Giotto Software in 2021 to all licensees of the Giotto Software, including AirPro: "Giotto (19.1)" on March 19, 2021; "Giotto (19.2)" on June 7, 2021; and "Giotto (19.3)" on September 23, 2021.

130.  Upon information and belief, AirPro received and installed the Giotto (19.1), Giotto (19.2), and Giotto (19.3) software updates for each AirPro device that used the Giotto Software.

131.  Upon information and belief, AirPro has repeatedly used as part of its provision of remote automotive diagnostic services to its customers various

versions of the Giotto Software, including but not limited to versions 17.0, 17.1, 17.2, 17.3, 18.0, 18.1, 18.2, 18.3, 19.0, 19.1, 19.2, 19.3, and 20.0.

132.  Upon information and belief, AirPro continues to use the aforementioned versions of the Giotto Software and continues to obtain substantial revenue thereby.

133.  AirPro thus repeatedly assented to the terms of the EULA not only by installing and using major updates to the Giotto Software in December 2020 and throughout 2021, but also by using the Giotto Software for years after December 24, 2020.

134.  AirPro was additionally provided with notice of the EULA via written correspondence from Opus on or about May 24, 2021, August 25, 2021, and October 4, 2021.

**AirPro's Numerous Breaches of the EULA.**

135.  Section 3.2 (v) of the EULA expressly states: "you may not, nor may you permit any third party to . . . make statements that diagnostic services performed using Software are equivalent to the OE diagnostic system[.]" Ex. H.

136.  Despite the warning in the March 11 Letter, the Ford-AirPro Lawsuit, and additional verbal and written warnings in correspondence between Opus and AirPro, AirPro continued to make false and misleading public statements regarding the Giotto Software.

137.   For example, AirPro has made and upon information and belief continues to make statements that it uses OEM automotive diagnostic software—not aftermarket software—and in fact only uses OEM software, when the reality is AirPro almost always and has almost always used aftermarket diagnostic software to provide its remote automotive scanning services to its customers.

138.   In fact, AirPro has admitted that approximately 96%-98% of its diagnostic scans have been and are currently performed using the Giotto Software or other aftermarket diagnostic software.

139.   AirPro's public statements regarding the Giotto Software and other aftermarket software were highly misleading to the marketplace and AirPro's customers and allowed AirPro to unfairly compete with Opus using Opus' own product.

140.   These false and misleading public statements, including statements made from 2018-2021, constituted violations of the terms of the EULA, specifically those contained in Section 3.2(v), which prohibited end users from "mak[ing] statements that diagnostic services performed using Software are equivalent to the OE diagnostic system[.]" *See* Ex. H.

141.   Further, AirPro repeatedly violated additional provisions of the EULA.

142.   Specifically, for years leading up to 2021, AirPro allowed its customers to perform "self-directed scans" or "Self Scans" using the Giotto Software in violation of the EULA.

143.   In fact, AirPro allowed its customers to perform 26,707 Self Scans using the Giotto Software in 2021 alone, and an additional 97,179 Self Scans using the Giotto Software in prior years.

144.   Section 11.2 of the EULA expressly prohibited AirPro from transferring or assigning licenses to the Giotto Software without prior written consent, which AirPro never obtained. *See* Ex. H.

145.   AirPro's practice of allowing its customers to perform Self Scans violated Section 3.2(iii) of the EULA, which prohibited AirPro from "lend[ing], leas[ing], sublicens[ing], or redistribut[ing] the Software to any third party." *Id.*

146.   AirPro sometimes charged its customers a fee for their performing Self Scans using the Giotto Software, and sometimes allowed its customers to perform Self Scans using the Giotto Software for free.

147.   On August 25, 2021, Opus sent AirPro another letter ("August 25 Letter") explaining that AirPro's statements about the Giotto Software were misleading and that its use (and that of its customers) were in violation of the express terms of the EULA.

148.    Opus explained in the August 25 Letter that not only did AirPro's marketing of its services provided using the Giotto Software and practice of allowing customers to perform "Self Scans" constitute direct violations of the EULA but could also subject Opus to liability.

149.    Opus further explained in a separate letter sent to AirPro on or around October 4, 2021 that:

> [AirPro's] response to the motion for summary judgment [in the Ford-AirPro Lawsuit] amplifies that AirPro's position with respect to OEM is entirely inconsistent with ours. We find this troublesome for many reasons, and we cannot support any use of our product where it is represented as OEM or OEM equivalent, *especially in the determination of vehicle safety.*

(emphasis added).

150.    AirPro refused to stop misrepresenting and misusing the Giotto Software and, on information and belief, has never stopped misrepresenting and misusing the Giotto Software.

151.    By letter dated October 21, 2021, Opus terminated AirPro's license to the Giotto Software effective October 25, 2021 ("License Termination").

152.    Prior to the License Termination, AirPro viewed Opus' competition with AirPro as friendly and proper.

153.    AirPro has described the License Termination as a "tipping point" that *somehow made AirPro believe that Opus had improperly used purported "Confidential Information" of AirPro.*

### The Michigan Lawsuit and Opus' Discovery of AirPro's Copyright Infringement

154. On December 8, 2022, AirPro filed a lawsuit against Opus, AutoEnginuity, Drew, and Herron in the U.S. District Court for the Eastern District of Michigan, Case No. 22-12969-LVP-EAS ("Michigan Lawsuit").

155. Discovery in the Michigan Lawsuit has revealed that *as of late 2024* AirPro was still misrepresenting the aftermarket software it currently uses as OEM software, and still has issues with customers thinking they are getting diagnostic scans performed using OEM software when they are not.

156. For example, in a Facebook Post dated December 3, 2024 (and comments thereto), multiple AirPro customers expressed their surprise and concern to learn that apparently many of the diagnostic scans they had been receiving from AirPro were not OE scans, but instead were aftermarket scans:

    a.   One customer stated: "AirPro's lack of communication and transparency has been BEYOND disappointing, and I felt it was important to share my experience with others in the industry." "I truly feel many of their customers think they are getting OE scans when in fact they are getting Aftermarket." "[T]he point of my post" was "[t]o bring awareness to shops using this service under the assumption they are getting OE scans but are really getting an aftermarket scan."

b.  Another customer states: "[A]irpro said they wouldn't do things like this and reiterated it when the astech fiasco happened. It's who we use and sounds like I have to waste time out of my day to give them a call today[.]"

c.  Another customer stated: "[W]e are under the impression, that we are getting oem scan and pretty much it's aftermarket software that they use[.]"

d.  Another customer stated: "@Josh McFarlin are you able to address/clarify this? Is Airpro not performing OE scans?"

e.  Another customer stated: "Very disappointing. We've been using Airpro but I'll start looking at other options and sending to dealer . . . Thanks for making us aware."

157.  Further, one of AirPro's former customers, Chris Herron, owner of Big Chris Collision, LLC ("Big Chris"), signed a Declaration on March 11, 2025 in the Michigan Lawsuit explaining that:

a.  "We used to use the 'AirPro' scanning device to scan vehicles in our shop.  It was confusing and difficult to know whether the AirPro scans were done using OE software or not."

b.  Big Chris initially believed that "most, if not all, of AirPro's scans were OE scans, especially given the prices they were charging for their scans."

c. "A few years ago, [Big Chris] caught [AirPro] using aftermarket scan tools on their AirPro device, instead of OE tools."

d. Big Chris raised this concern to AirPro, and AirPro "assured [Big Chris] they would switch [Big Chris] to OE-only scanning."

e. Despite AirPro's representations, Big Chris was forced to contact AirPro again expressing concern that AirPro was continuing to provide "aftermarket scans, and not the OE scans they had promised[.]"  AirPro would not give Big Chris a straight answer.

f. Big Chris "grew frustrated with this confusion and AirPro's lack of a transparent response[.]"

g. Big Chris posted on the internet "pointing out that AirPro was not using OE tools or doing OE scans" because Big Chris believed it "was important for people to understand the truth about AirPro's scans."

h. AirPro then banned Big Chris as a customer and disabled Big Chris' AirPro device.

i. Big Chris switched to Opus for scanning needs.

158.  Upon information and belief, there are still instances to this day where AirPro's customers believe they are getting OEM scans when they are getting aftermarket scans from AirPro, and AirPro is charging its customers OEM pricing for aftermarket scans.  Further, on information and belief, AirPro

is misleading its customers to believe they are in compliance with the OEM position papers or OEM requirements for a repair by falsely leading customers to believe that diagnostic scans performed by AirPro always (or almost always) use OEM software, when they in fact almost always use aftermarket software.

159.    Indeed, in late 2024, AirPro's President Josh McFarlin admitted that AirPro's advertising and messaging to its customers still has room for improvement.

160.    One of AirPro's claims in the Michigan Lawsuit was that Opus wrongfully terminated AirPro's "license and ability to use the Giotto [Software]" and that AirPro suffered damages as a result of the License Termination.

161.    Consistent with this allegation by AirPro, Opus believed from October 2021 to December 2024 that AirPro had stopped using the Giotto Software.

162.    In January 2025, however, through discovery in the Michigan Lawsuit, Opus discovered that AirPro continued to use the Giotto Software to provide remote diagnostic services to its customers for years after the License Termination.

163.    Opus only became aware of AirPro's continued use of the Giotto Software after the License Termination after reviewing the ~60,000 pages of

documents produced by AirPro two weeks before the close of discovery in the Michigan Lawsuit on November 5, 2024.

164.   Upon information and belief, AirPro has used and uses versions 18.0, 18.1, 18.2, 18.3, 19.0, 19.1, 19.2, 19.3, and 20.0 of the Giotto Software, as well as prior versions of the Giotto Software, without a valid license, and such use violates Opus' copyrights in the Giotto Software.

165.  Upon information and belief, AirPro has reproduced and reproduces versions 18.0, 18.1, 18.2, 18.3, 19.0, 19.1, 19.2, 19.3, and 20.0 of the Giotto Software, as well as prior versions of the Giotto Software, without a valid license, and such reproduction violates Opus' copyrights in the Giotto Software.

166.   Upon information and belief, AirPro has copied and copies version 18.0, 18.1, 18.2, 18.3, 19.0, 19.1, 19.2, 19.3, and 20.0 of the Giotto Software, as well as prior versions of the Giotto Software, without a valid license, by installing the Giotto Software on multiple devices, includes AirPro's "Airpro" devices.  Such copying violates Opus' copyrights in the Giotto Software.

167.  Upon information and belief, AirPro has distributed and distributes copies of versions 18.0, 18.1, 18.2, 18.3, 19.0, 19.1, 19.2, 19.3, and 20.0 of the Giotto Software, and prior versions of the Giotto Software, to the public by sale or other transfer of ownership, or by rental, lease or lending

without a valid license, and such distribution violates Opus' copyrights in the Giotto Software.

168.   Upon information and belief, AirPro has marketed, sold, furnished, and supported, and markets, sells, furnishes, and supports products and services containing or utilizing unauthorized copies of versions 18.0, 18.1, 18.2, 18.3, 19.0, 19.1, 19.2, 19.3, and 20.0 of Opus' Giotto Software, as well as prior versions of the Giotto Software, throughout the United States, and such activities violate Opus' copyrights in the Giotto Software.

169.   AirPro's actions were willful and intentional and done in an effort to harm Opus and benefit AirPro.

170.   Opus has retained the undersigned counsel to represent it in this action and is entitled to recover its reasonable attorneys' fees and costs.

171.   All conditions precedent to the claims for relief asserted herein have been performed, satisfied, or waived.

## FIRST CLAIM FOR RELIEF
(Copyright Infringement under 17 U.S.C. §§ 101 *et seq.*)

172.   The allegations contained in Paragraph 1-171 are incorporated herein by this reference.

173.   The Giotto Software contains original material and is copyright subject matter.

174.    AirPro had access to the Giotto Software through the licenses it purchased from AutoEnginuity and Opus, including versions 18.0, 18.1, 18.2, 18.3, 19.0, 19.1, 19.2, 19.3, and 20.0, as well as prior versions of the Giotto Software.

175.    AirPro has intentionally and willfully used, reproduced, copied, and distributed copies of the Giotto Software for significant revenue and profit after the License Termination, and thus without a valid license.

176.    AirPro's unauthorized use, reproduction, copying, and distribution of the Giotto Software constitute violations of U.S Copyright TX 9-481-447.

177.    AirPro's unauthorized use, reproduction, copying, and distribution of the Giotto Software constitute violations of U.S. Copyright TX 9-507-507.

178.    AirPro's unauthorized use, reproduction, copying, and distribution of the Giotto software constitute violations of U.S. Copyright TX 9-508-521.

179.    AirPro's unauthorized use, reproduction, copying, and distribution of the Giotto Software constitute violations of U.S. Copyright TX 9-507-862.

180.    AirPro's unauthorized use, reproduction, copying, and distribution of the Giotto Software constitute violations of U.S. Copyright TX 9-507-431.

181.    Unless AirPro is enjoined, AirPro will continue to infringe upon Opus' copyrights.

182.    AirPro's unauthorized use, reproduction, copying, and distribution of the Giotto Software have caused Opus to lose substantial revenues.

183.  As a direct result of such copyright infringement, Opus has sustained and will continue to sustain, substantial injury, irreparable harm, loss, and damages to be proven at trial.

184.  Opus is entitled to a permanent injunction restraining AirPro, its officers, directors, agents, employees, representatives, and all persons acting in concert with them, from engaging in further acts of copyright infringement.

185.  Opus is further entitled to recover from AirPro the gains, profits, and advantages AirPro has obtained as a result of its acts of copyright infringement.  Opus is unable to ascertain the full extent of the gains, profits, and advantages AirPro has obtained by reason of its acts of copyright infringement, but Opus is informed and believes, and on that basis alleges, that AirPro has obtained such gains, profits, and advantages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
(Unjust Enrichment)

186.  The allegations contained in Paragraph 1-171 are incorporated herein by this reference.

187.  Opus conferred a benefit on AirPro by providing AirPro with access to the Giotto Software so that AirPro had the ability to perform automotive diagnostic scanning services to compete in the automotive collision repair market using the capabilities of the Giotto Software.

188.   The benefit to AirPro consisted of not only AirPro's actual use of the Giotto Software, but also AirPro's ability to use the Giotto Software (and the revenue/profits AirPro obtained associated therewith) as needed as an alternative to other diagnostic software, which diversified and enhanced AirPro's capabilities with respect to every diagnostic scan AirPro provided, even for scans for which AirPro did not actually use the Giotto Software.

189.   AirPro was aware of these benefits conferred by Opus.

190.   AirPro accepted these benefits.

191.  AirPro properly retained these benefits until the License Termination resulting from AirPro's material breaches of the EULA.

192.  AirPro improperly retained these benefits after the License Termination.

193.  AirPro's improper retention of these benefits after the License Termination under the circumstances makes it inequitable for AirPro to retain these benefits without paying the value thereof.

## THIRD CLAIM FOR RELIEF
### (Unfair Competition)

194.   The allegations contained in Paragraphs 1-171 are incorporated herein by this reference.

195.  This is an action against AirPro for common law unfair competition.

196.   Opus and AirPro are competitors with respect to the provision of remote automotive scanning, diagnostic, calibration, and programming services.

197.   Opus and AirPro compete to provide their services to the same sets of customers, including but not limited to automotive collision repair shops and automotive dealerships.

198.   AirPro has engaged in deceptive conduct by advertising its aftermarket automotive diagnostic scanning services as OEM diagnostic scanning services.

199.   Upon information and belief, AirPro overcharges its customers for its aftermarket automotive diagnostic scanning services by intentionally and/or knowingly leading its customers to believe that they are paying for and receiving OEM automotive diagnostic scanning services from AirPro, when they are not.

200.   AirPro is well aware of the difference between aftermarket and OEM diagnostic software and is also well aware that the distinction between the two is highly material to consumers of AirPro's and Opus' services.

201.   In fact, AirPro chose to misrepresent and falsely advertise the nature of its automotive scanning services because it considered "aftermarket" to be a "bad" and "dirty" word in the automotive collision repair industry associated with "inferiority."

202.   On information and belief, AirPro's customers would not pay the prices they pay for AirPro's automotive diagnostic scanning services if AirPro's customers knew the true nature of AirPro's scanning services.

203.   The unfair competitive nature of AirPro's conduct is exacerbated by the fact that AirPro has used and on information and belief continues to use unauthorized copies of Opus' Giotto Software to unfairly compete with Opus by successfully deceiving customers as to the nature of AirPro's diagnostic scanning services, which also enables AirPro to overcharge customers for its services.

204.   AirPro's use of unauthorized copies of the Giotto Software, combined with AirPro's ability to overcharge its customers through its deceptive advertising, has furthered and furthers AirPro's ability to unfairly compete with Opus by wrongfully increasing AirPro's profit margins at the expense of Opus and AirPro's customers.

205.   AirPro's acts as set forth above were willful and malicious.

206.   AirPro's acts as set forth above have resulted in and are likely to result in consumer confusion.

207.   As a result of AirPro's actions as set forth above, Opus has suffered significant injury including but not limited to irreparable harm and injury, unjustified and unwarranted loss of customers, and actual damages as a result of AirPro's unfair competition.  Additionally, AirPro has been unjustly enriched

by its wrongful actions and has wrongfully reaped substantial revenue and profits that are subject to disgorgement and award to Opus as AirPro's "biggest competitor."

## FOURTH CLAIM FOR RELIEF
(Florida Deceptive and Unfair Trade Practices)

208. The allegations contained in Paragraphs 1-171 are incorporated herein by this reference.

209. This claim arises under the Florida Deceptive and Unfair Trade Practices Act, section 501.201, *et seq.*, Florida Statutes ("FDUTPA").

210. Opus is an "aggrieved" person and a "consumer" under the FDUTPA and, as such, has standing to bring this claim, respectively, under sections 501.211(1)-(2), Fla. Stat.

211. AirPro has engaged in unfair methods of competition and/or unfair and/or deceptive acts or practices in the conduct of its trade, all in violation of Fla. Stat. § 501.204.

212. AirPro has knowingly, intentionally, and willfully engaged in a pattern and practice of actively misrepresenting and/or concealing the nature of the automotive diagnostic scanning services that it offers to its customers. Specifically, AirPro has misrepresented and/or concealed, continues to misrepresent and/or conceal, and on information and belief will continue to misrepresent and/or conceal the fact that AirPro always or almost always uses

aftermarket diagnostic scanning software in its provision of remote scanning services.

213.   AirPro has misrepresented, continues to misrepresent, and on information and belief will continue to misrepresent to its customers that AirPro either always or almost always uses OEM automotive diagnostic software in its provision of remote scanning services.  Alternatively, to the extent AirPro has stopped or will stop actively misrepresenting the nature of its automotive scanning services, AirPro has concealed, continues to conceal, and will continue to conceal that all or almost all of its automotive scanning services are provided using aftermarket software instead of OEM software.

214.   On information and belief, unless this Court orders AirPro to inform its actual and prospective customers of the true nature of its automotive scanning services, AirPro's customers will continue to be deceived into believing that AirPro only uses or almost always uses OEM diagnostic software in its provision of remote scanning services.

215.   Further, on information and belief, AirPro deceptively overcharges its customers by charging market prices for OEM scanning services that in reality are aftermarket scanning services.

216.   On information and belief, AirPro's customers only pay the prices for AirPro's diagnostic scanning services because AirPro's customers believe they are receiving automotive diagnostic scans from AirPro that are performed

using OEM diagnostic software, when AirPro's customers are in fact receiving automotive diagnostic scans performed using aftermarket software.

217.  AirPro's deception endangers both its customers, the clients of its customers, and the general public because the diagnostic scans AirPro provides are used by automotive repair shops and dealerships to determine whether or not a vehicle is safe to return to the road after being repaired.

218.  Further, on information and belief, AirPro has used and continues to use outdated versions of the Giotto Software to perform aftermarket diagnostic scans that AirPro's customers believe are diagnostic scans performed using up-to-date OEM diagnostic software.  This only exacerbates the actual and potential harm to AirPro's customers and consumers of automotive repair services nationwide (the providers of which are AirPro's customers).

219.  AirPro's use of outdated versions of the Giotto Software harms Opus by subjecting it to potential third-party liability for the faulty repairs of vehicles resulting from automotive collision repair shops using AirPro's diagnostic scanning services.

220.  AirPro's acts and practices as alleged herein also subject consumers of AirPro's services to liability for faulty repairs of vehicles that are repaired and deemed repaired based on the use of AirPro's diagnostic scanning services.

221.   AirPro's acts and practices as alleged herein: (i) offend public policy, (ii) were/are unethical, oppressive, and/or unscrupulous and/or (iii) cause and have caused Opus substantial unavoidable injury, and cause irreparable harm to Opus.

222.   For example, on information and belief, AirPro is able to obtain market share, customers, and a customer retention rate that AirPro would not otherwise be able to obtain without deceiving its customers and the automotive collision repair market into believing that AirPro always or almost always provides diagnostic scanning services performed using OEM software.

223.   On information and belief, AirPro uses aftermarket diagnostic software (including outdated versions of same) to reduce the cost of providing its services to thereby increase its profit margins, all at the expense of customer transparency and consumer and vehicular safety.

224.   AirPro's acts and practices damage Opus through AirPro's wrongful acquisition and retention of customers, market share, and profits resulting from AirPro's overcharging for its services and its marketplace and customer deception with respect to the nature and reliability of AirPro's scanning services.

225.   AirPro's acts and practices are *unfair* under § 501.204, Fla. Stat.

226.   AirPro's acts and practices are *deceptive* under § 501.204, Fla. Stat.

227.    Pursuant to Fla. Stat. § 501.211(1), entry of an injunction to enjoin AirPro from continuing to violate the Florida Deceptive and Unfair Trade Practices Act is appropriate and warranted.

228.    Pursuant to Fla. Stat. § 501.211(2), Opus is entitled to recover its actual damages, plus attorneys' fees and court costs as provided in § 501.2105.

## **PRAYER FOR RELIEF**

WHEREFORE, Opus pray for judgment against AirPro as follows:

1.    That AirPro have and recover nothing from Opus by way of this lawsuit;

2.    That the Court deny AirPro's requests for injunctive and/or equitable relief;

3.    Under all of Opus' claims for relief, that a permanent injunction be issued enjoining AirPro, its employees, agents, successors and assigns, and all those in active concert and participation with them, and each of them who receives notice directly or otherwise of such injunctions, from:

   a.    Further infringing upon Opus' copyrights, or printing, publishing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, displaying, or otherwise disposing of any products not

69

authorized by Opus bearing any simulation, reproduction, copy, or colorable imitation of Opus' copyrighted materials;

b.    Engaging in further violations of the Florida Unfair and Deceptive Trade Practices Act, and that AirPro be ordered to remedy its customer and marketplace deception by providing to each of its actual or prospective customers and posting prominently on its website for a one (1) year period the information subject to AirPro's possession and control that shows or reasonably reflects the true number or percentage of diagnostic scans AirPro provides and has provided using aftermarket diagnostic software as opposed to OEM diagnostic software, since 2016.

c.    Instructing, assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraph (a)-(b) above.

4.    For an order directing AirPro to deliver for destruction all unauthorized products, labels, signs, transparencies, electronic files, photographs, or images in AirPro's possession or under AirPro's control bearing Opus' copyrighted works or any simulation, reproduction, counterfeit, copy, or colorable imitation

thereof, and all plates, molds, matrices, programs, or other means of making the same.

5.    For an order requiring AirPro to pay Opus such damages as Opus has sustained as a consequence of AirPro's infringement of Opus' copyrights and to account for all gains, profits, and advantages derived by AirPro from the infringement of Opus' copyrights or, as an alternative to recovering actual damages and any additional profits under the Copyright Act, ordering AirPro to pay Opus the statutory damages thereunder for Opus' copyrighted works infringed by AirPro.

6.    For an order awarding Opus for Opus' copyrighted works infringed by AirPro and an increased award of statutory damages for willful infringement pursuant to 17 U.S.C. § 504.

7.    For a declaratory judgment that AirPro's acts and practices violate the Florida Unfair and Deceptive Trade Practices Act.

8.    For an order that the Court award Opus its actual damages, plus attorneys' fees and court costs as provided in Fla. Stat. § 501.211(2).

9.    For an order that the Court award Opus its compensatory damages, consequential and special damages, disgorgement of AirPro's wrongfully obtained profits, and royalties.

10. For an order that the Court award Opus other damages in an amount to be determined at trial, plus pre- and post-judgment interest at the legal rate;

11. For an order that the Court award costs of this action together with reasonable attorneys' fees, investigators' fees, and pre-judgment interest to Opus incurred in defending this lawsuit and prosecuting Opus' Counterclaims;

12. For an order directing that AirPro file with the Court and serve upon Opus' counsel within thirty (30) days after entry of such judgment, a report in writing under oath, setting forth in detail the manner and form in which AirPro has complied with the above.

13. For an order requiring AirPro to file with the Court and provide to Opus an equitable accounting and disgorgement of all revenues and/or profits wrongfully realized by AirPro.

14. For an order directing that this Court retain jurisdiction of this action for the purpose of enabling Opus to apply to the Court at any time for such further orders and interpretation or execution of any order entered in this action, for the modification of any such order, for the enforcement or compliance therewith, and for the punishment of any violations thereof.

15.     Based on information reasonably expected to be learned in
discovery, Opus intends to subsequently amend its Counterclaims
to seek punitive damages under Section 768.72(1), Florida
Statutes.

16.     For such other and further relief as the Court deems just and
proper.

### **DEMAND FOR A JURY TRIAL**

Opus hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

SMITH HULSEY & BUSEY

By: /s/ Patrick P. Coll
    Patrick P. Coll
    Florida Bar Number 084670
    One Independent Drive, Suite 3300
    Jacksonville, Florida 32202
    Office: (904)359-7700
    Fax: (904)359-7708
    pcoll@smithhulsey.com

-and-

WYRICK ROBBINS YATES & PONTON LLP

By: /s/ Samuel A. Slater
    Samuel A. Slater
    NC Bar No. 43212 (application *pro hac vice* forthcoming)
    Email: sslater@wyrick.com
    T. Nelson Hughes, Jr.
    NC Bar No. 59342 (application *pro hac vice* forthcoming)
    Email: nhughes@wyrick.com
    4101 Lake Boone Trail, Suite 300
    Raleigh, North Carolina 27607
    Telephone.: (919) 781-4000
    Facsimile:   (919) 781-4865

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of June, 2025 a copy of the foregoing

**Defendants' Answer, Affirmative Defenses, and Counterclaims** was

filed electronically with the Clerk of Court using the CM/ECF system, which

will cause notice of this filing to be sent to all counsel of record.

<u>/s/ Patrick P. Coll          </u>
Attorney